## ANGELA CORNELIO *v.* STAMFORD HOSPITAL
## (SC 15826)

Callahan, C. J., and Borden, Norcott, Katz, Palmer, McDonald and Peters, Js.

Argued April 28—officially released August 4, 1998

*Brenden P. Leydon,* for the appellant (plaintiff).

*Douglas R. Steinmetz,* with whom was *Charles D. Ray,* for the appellee (defendant).

*Mark R. Kravitz, Alex V. Chachkes* and *Jennifer D. Jackson* filed a brief for the Connecticut Hospital Association, Inc., as amicus curiae.

*Opinion*

CALLAHAN, C. J. The dispositive issue in this appeal is whether the plaintiff, Angela Cornelio, has a right to immediate possession of pathology slides obtained and analyzed in the course of her medical care by the defendant, Stamford Hospital. We conclude that she does not have such a right.

The following facts and procedural history are undisputed. A Papanicolaou test, or Pap smear, is a test commonly used to screen for cancer of the cervix and endometrium. Dorland's Illustrated Medical Dictionary (28th Ed. 1994) p. 1681. In brief, a specimen that contains cervical cells is removed from a patient and fixed on a laboratory slide. Id. After the Papanicolaou stain, which enhances the visibility of cell characteristics, has been applied to the slide, the specimen is examined under a microscope for cellular abnormalities. Id.; see also G. Papanicolaou, Atlas of Exfoliative Cytology (1963) pp. 3–6.

Pap smear specimens were taken from the plaintiff by her physician, Frances Ginsburg, on August 2, 1993, August 22, 1994, January 9, 1995, February 9, 1995, and November 2, 1995. The plaintiff voluntarily consented to having a specimen taken prior to undergoing each of those procedures. The record, however, does not include a consent form documenting the parameters of the plaintiff's consent to any of the five Pap smear tests. Ginsburg sent each of the Pap smear specimens taken from the plaintiff to the defendant's pathology department for interpretation. The defendant analyzed those specimens and prepared written reports of its findings, dated August 21, 1993, August 25, 1994, January 13, 1995, February 14, 1995, and November 8, 1995.

The plaintiff alleges that on November 22, 1995, she was diagnosed with Stage IB endocervical adenocarcinoma, and that she subsequently underwent a radical hysterectomy at Yale-New Haven Hospital. In February, 1996, at the plaintiff's request, the defendant sent the pathology slides that contain the Pap smear specimens taken from the plaintiff[1] to Yale-New Haven Hospital for review. The Yale-New Haven Hospital pathology department analyzed the slides and prepared a report of its findings. That report provides that the slides contain "highly atypical endocervical cells." The slides were then returned to the defendant.

In August, 1996, the plaintiff requested that the defendant release the slides directly to her. The defendant informed the plaintiff that it would not do so because the slides contained cells that could not be duplicated. The defendant agreed, however, to allow experts retained by the plaintiff to examine the slides at the defendant's pathology department.

The plaintiff subsequently brought an action against the defendant in the Superior Court, by way of a bill of discovery, seeking an order compelling the defendant to release the slides to her. Specifically, the plaintiff maintained that their release was necessary in order for her to fulfill her obligation under General Statutes § 52-190a[2] to ascertain, prior to bringing a malpractice

[1] In this opinion, we refer to the pathology slides that contain the Pap smear specimens taken from the plaintiff as the slides.

[2] General Statutes § 52-190a provides in relevant part: "(a) No civil action shall be filed to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, whether in tort or in contract, in which it is alleged that such injury or death resulted from the negligence of a health care provider, unless the attorney or party filing the action has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. The complaint or initial pleading shall contain a certificate, on a form prescribed by the rules of the superior court, of the attorney or party filing the action that such reasonable inquiry gave rise to a good faith belief that grounds exist for an action against each

claim against the defendant, a good faith basis for such a claim. The trial court concluded that the plaintiff did not need to obtain possession of the slides in order to satisfy the requirements of § 52-190a. Consequently, the court denied the plaintiff's request for an order compelling the defendant to release the slides directly to her.

Thereafter, the plaintiff brought this action for replevin against the defendant pursuant to General Statutes § 52-515[3] seeking possession of the slides and damages. The defendant moved for summary judgment, maintaining that the plaintiff lacked both a property interest in the slides and a right to their immediate possession. The plaintiff thereafter also moved for summary judgment, claiming a property interest in the slides and a right to their immediate possession.[4] The trial

named defendant. For purposes of this section, such good faith may be shown to exist if the claimant or his attorney has received a written opinion, which shall not be subject to discovery by any party except for questioning the validity of the certificate, of a similar health care provider as defined in section 52-184c, which similar health care provider shall be selected pursuant to the provisions of said section, that there appears to be evidence of medical negligence. In addition to such written opinion, the court may consider other factors with regard to the existence of good faith. If the court determines after the completion of discovery, that such certificate was not made in good faith and that no justiciable issue was presented against a health care provider that fully cooperated in providing informal discovery, the court upon motion or upon its own initiative, shall impose upon the person who signed such certificate, a represented party or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorney's fee. The court may also submit the matter to the appropriate authority for disciplinary review of the attorney if the claimant's attorney submitted the certificate. . . ."

[3] General Statutes § 52-515 provides: "The action of replevin may be maintained to recover any goods or chattels in which the plaintiff has a general or special property interest with a right to immediate possession and which are wrongfully detained from him in any manner, together with the damages for such wrongful detention."

[4] The plaintiff's motion for summary judgment was based entirely upon an affidavit in which she stated that, at the time she consented to the Pap smear procedures, it was her unstated assumption that she would retain ownership of, and a right to control over, the specimens taken from her body.

court concluded that, as a matter of law, the plaintiff lacked a property interest in the slides and that, consequently, the plaintiff was not entitled either to replevin of the slides or to damages. The trial court, therefore, granted the motion for summary judgment filed by the defendant.

The plaintiff appealed from the judgment of the trial court to the Appellate Court. We transferred the appeal to this court pursuant to Practice Book § 4024, now § 65-2, and General Statutes § 51-199 (c).

In Connecticut, replevin proceedings are governed by statute rather than by the rules that apply to common-law actions of replevin. *Staub* v. *Anderson*, 152 Conn. 694, 695, 211 A.2d 691 (1965); *M. Itzkowitz & Sons, Inc.* v. *Santorelli*, 128 Conn. 195, 198, 21 A.2d 376 (1941); *Belknap Savings Bank* v. *Robinson*, 66 Conn. 542, 547, 34 A. 495 (1895). Section 52-515 provides that "[t]he action of replevin may be maintained to recover any goods or chattels in which the plaintiff has a general or special property interest with a right to immediate possession and which are wrongfully detained from him in any manner, together with the damages for such wrongful detention." Thus, in order to replevin the slides, the plaintiff must establish that: (1) the slides are "goods or chattels" within the meaning of § 52-515; (2) she has a "property interest" in the slides; (3) she has a right to immediate possession of the slides; and (4) the defendant has wrongfully detained the slides. See *D'Addario* v. *Abbott*, 128 Conn. 506, 507–508, 24 A.2d 245 (1941); *M. Itzkowitz & Sons, Inc.* v. *Santorelli*, supra, 198.

The plaintiff claims that the trial court's rendering of summary judgment in favor of the defendant was improper because there was a genuine issue of material fact as to whether the plaintiff had a property interest and a right to immediate possession of the specimens

removed from her body during the procedures she had undergone.[5] The plaintiff argues that: (1) a person's body is "property"; (2) consequently, prior to removal from the plaintiff's body, the Pap smear specimens contained on the slides were her "property" and, therefore, her "chattel" within the meaning of § 52-515; (3) the plaintiff intended to retain her "property interest" in and her right to control of the specimens; and (4) as a result, § 52-515 provides the plaintiff a right to replevin of the slides that contain those specimens.

The defendant argues, conversely, that the plaintiff's claimed intent to retain ownership and a right to control of the Pap smear specimens contained on the slides does not raise an issue of material fact. The defendant contends that it was entitled to summary judgment because, as a matter of law, the plaintiff lacks both a property interest in and a right to immediate possession of the slides as required by § 52-515.

Assuming, without deciding, that the specimens are "property" and "chattel" within the meaning of § 52-515,[6] and further assuming, without deciding, that the

[5] The plaintiff also claims that the trial court improperly failed to grant her motion for summary judgment. Specifically, the plaintiff maintains that she was entitled to summary judgment because the defendant offered no evidence to rebut her claim that she intended to retain ownership and control of the specimens removed from her body. Because our conclusion, later in this opinion, that the plaintiff, as a matter of law, lacks a right to immediate possession of the slides that contain those specimens is dispositive of this appeal, we disagree with this claim.

[6] This new, and thorny, question has as yet been the subject of very little authority and commentary. See, e.g., *Moore* v. *Regents of University of California*, 51 Cal. 3d 120, 136–37, 793 P.2d 479, 271 Cal. Rptr. 146 (1990), cert. denied, 499 U.S. 936, 111 S. Ct. 1388, 113 L. Ed. 2d 444 (1991) (refusing to apply property law to cells and bodily tissues); see generally E. Gold, Body Parts: Property Rights and the Ownership of Human Biological Materials (1996) (arguing that, for reasons of policy, claims to human biological material ought not be subject to property law analysis); compare *Moore* v. *Regents of University of California*, 215 Cal. App. 3d 709, 249 Cal. Rptr. 494, 506–507 (1988) (concluding that bodily tissue is property for purposes of action for conversion), rev'd in part, *Moore* v. *Regents of University of*

plaintiff has retained a "property interest" in the specimens, we, nevertheless, agree with the defendant that the plaintiff, as a matter of statutory law, lacks a right to immediate personal possession of the slides that contain those specimens. Consequently, the defendant was entitled to summary judgment.

An overview of the statutory scheme pertaining to patient access to hospital records is necessary to a resolution of this appeal. Historically, only General Statutes §§ 4-104 and 4-105[7] addressed such access. Section 4-104 provides that private hospitals receiving state

*California*, supra, 51 Cal. 3d 120; comment, "Toward the Right of Commerciality: Recognizing Property Rights in the Commercial Value of Human Tissue," 34 U.C.L.A. L. Rev. 207 (1986) (arguing that bodily tissue is property within meaning of bailment law).

[7] General Statutes § 4-104 provides: "Each private hospital, public hospital society or corporation receiving state aid shall, upon the demand of any patient who has been treated in such hospital and after his discharge therefrom, permit such patient or his physician or authorized attorney to examine the hospital record, including the history, bedside notes, charts, pictures and plates kept in connection with the treatment of such patient, and permit copies of such history, bedside notes and charts to be made by such patient, his physician or authorized attorney. If any such hospital, society or corporation is served with a subpoena issued by competent authority directing the production of such hospital record in connection with any proceedings in any court, the hospital, society or corporation upon which such subpoena is served may, except where such record pertains to a mentally ill patient, deliver such record or at its option a copy thereof to the clerk of such court. Such clerk shall give a receipt for the same, shall be responsible for the safekeeping thereof, shall not permit the same to be removed from the premises of the court and shall notify the hospital to call for the same when it is no longer needed for use in court. Any such record or copy so delivered to such clerk shall be sealed in an envelope which shall indicate the name of the patient, the name of the attorney subpoenaing the same and the title of the case referred to in the subpoena. No such record or copy shall be open to inspection by any person except upon the order of a judge of the court concerned, and any such record or copy shall at all times be subject to the order of such judge. Any and all parts of any such record or copy, if not otherwise inadmissible, shall be admitted in evidence without any preliminary testimony, if there is attached thereto the certification in affidavit form of the person in charge of the record room of the hospital or his authorized assistant indicating that such record or copy is the original record or a copy thereof, made in the regular course of the business of the hospital,

aid "shall, upon the demand of any patient . . . permit such patient or his physician or authorized attorney to examine the hospital record . . . and permit copies of such history, bedside notes and charts to be made . . . ." Thus, § 4-104 provides a patient who has been discharged from a private hospital that receives state aid a statutory right to examine and to obtain copies of his hospital records. In 1978, concluding that the term "state aid" in § 4-104 refers only to appropriations by the General Assembly and not to property tax exemptions, payments made to a hospital pursuant to contractual relations with the state, or to reimbursement for services rendered to indigent patients; *Doe* v. *Institute of Living, Inc.*, 175 Conn. 49, 64–65, 392 A.2d 491 (1978);

and that it was the regular course of such business to make such record at the time of the transactions, occurrences or events recorded therein or within a reasonable time thereafter. A subpoena directing production of such hospital record shall be served not less than twenty-four hours before the time for production, provided such subpoena shall be valid if served less than twenty-four hours before the time of production if written notice of intent to serve such subpoena has been delivered to the person in charge of the record room of such hospital not less than twenty-four hours nor more than two weeks before such time for production."

General Statutes § 4-105 provides: "If any patient who has received treatment in any such hospital, after his discharge from such hospital, has made written application to such hospital, hospital society or corporation for permission to examine his record as such patient in such hospital and has been refused permission to examine or copy the same, such patient may file a written motion addressed to any judge of the Superior Court, praying for a disclosure of the contents of such hospital record relating to such patient and for a production of the same before such judge. Upon such application being filed, the judge to whom the same has been presented shall cause reasonable notice to be given to such hospital, hospital society or corporation of the time when and place where such petition will be heard, and such judge, after due hearing and notice, may order the officer authorized to act in the capacity of manager of such hospital to produce before him and deliver into his custody the history, bedside notes, charts, pictures and plates of such patient for the purpose of being examined or copied by such patient, his physician or authorized attorney. Each officer of any hospital having custody of the history, bedside notes, charts, pictures or plates of any patient therein, who refuses to produce such record before such judge, pursuant to the provisions of this section, shall be fined not more than one hundred dollars or imprisoned not more than six months or both."

this court further concluded that a private hospital that did not receive state aid had *no* legal obligation to allow patients to examine or obtain copies of their hospital records.[8] Id., 65 ("[i]t is not for this court to impose obligations not intended by the legislature"). Thus, patients' rights regarding access to their private hospital records historically were limited to a *statutory* right to examine or copy the records of those private hospitals that received state aid.

In 1992, however, the legislature enacted General Statutes § 19a-490b,[9] which provides patients of all hospitals licensed by the state a right to examine and obtain copies of their hospital records. The circumstances surrounding the enactment of § 19a-490b are instructive. In 1983, the legislature enacted the access to patients' medical records act; General Statutes §§ 20-7b through 20-7e;[10] to provide patients with access to health records

---

[8] The plaintiff does not claim that the defendant receives "state aid" within the meaning of § 4-104.

[9] General Statutes § 19a-490b, as amended by Public Acts 1997, No. 97-216, provides in relevant part: "(a) Upon the written request of a patient, his attorney or authorized representative, or pursuant to a written authorization, an institution licensed pursuant to this chapter shall furnish to the person making such request a copy of the patient's health record, including but not limited to, copies of bills, laboratory reports, prescriptions and other technical information used in assessing the patient's health condition. No such institution shall charge more than sixty-five cents per page, including any research fees, clerical fees, handling fees or related costs, and the cost of first class postage, if applicable, for furnishing a health record pursuant to this subsection, except such an institution may charge the amount necessary to cover its cost of materials for furnishing a copy of an x-ray.

"(b) No institution licensed pursuant to this chapter shall charge for furnishing a health record or part thereof to a patient, his attorney or conservator if the record or part thereof is necessary for the purpose of supporting a claim or appeal under any provision of the Social Security Act and the request for the records is accompanied by documentation of the claim or appeal. An institution shall furnish the requested record within thirty days of the request, unless the request was received in less than thirty days subsequent to the date the patient was discharged, in which case the institution shall furnish the requested record upon its completion. . . ."

[10] General Statutes § 20-7b provides: "For purposes of sections 20-7b to 20-7e, inclusive:

prepared by individual health care providers such as physicians and dentists. See Public Acts 1983, No. 83-413 (P.A. 83-413). The *initial* version of House Bill No. 5908, the bill that eventually was enacted as P.A. 83-413, and codified as General Statutes (Rev. to 1985)

"(a) 'Patient' means a natural person who has received health care services from a provider for treatment of a medical condition, or a person he designates in writing as his representative; and

"(b) 'Provider' means any person or organization that furnishes health care services and is licensed or certified to furnish such services pursuant to chapters 370 to 373, inclusive, 375 to 384a, inclusive, 388, 398 and 399 or is licensed or certified pursuant to chapter 368d."

General Statutes § 20-7c provides: "(a) A provider, except as provided in section 4-194, shall supply to a patient upon request complete and current information possessed by that provider concerning any diagnosis, treatment and prognosis of the patient.

"(b) Upon a written request of a patient, his attorney or authorized representative, or pursuant to a written authorization, a provider, except as provided in section 4-194, shall furnish to the person making such request a copy of the patient's health record, including but not limited to, bills, x-rays and copies of laboratory reports, contact lens specifications based on examinations and final contact lens fittings given within the preceding three months or such longer period of time as determined by the provider but no longer than six months, records of prescriptions and other technical information used in assessing the patient's health condition. No provider shall charge more than forty-five cents per page, including any research fees, handling fees or related costs, and the cost of first class postage, if applicable, for furnishing a health record pursuant to this subsection, except such provider may charge a patient the amount necessary to cover the cost of materials for furnishing a copy of an x-ray, provided no such charge shall be made for furnishing a health record or part thereof to a patient, his attorney or authorized representative if the record or part thereof is necessary for the purpose of supporting a claim or appeal under any provision of the Social Security Act and the request is accompanied by documentation of the claim or appeal. A provider shall furnish a health record requested pursuant to this section within thirty days of the request.

"(c) If a provider, as defined in section 20-7b, reasonably determines that the information is detrimental to the physical or mental health of the patient, or is likely to cause the patient to harm himself or another, he may withhold the information from the patient. The information may be supplied to an appropriate third party or to another provider who may release the information to the patient. If disclosure of information is refused by a provider under this subsection, any person aggrieved thereby may, within thirty days of such refusal, petition the superior court for the judicial district in which he resides for an order requiring the provider to disclose the information. Such a proceeding shall be privileged with respect to assignment for trial.

§§ 20-7b through 20-7e, required licensed physicians to release "a patient's medical records upon receipt of proper authorization by the patient or his duly authorized agent." Proposed House Bill No. 5908. The version of House Bill No. 5908 actually enacted, however, provided that "[u]pon a patient's written request, a provider . . . shall furnish to a patient at a reasonable cost to such patient a *copy* of the patient's health record, including but not limited to, x-rays and copies of laboratory reports, prescriptions and other technical information used in assessing the patient's health condition." (Emphasis added.) P.A. 83-413, § 2 (b); see General Statutes (Rev. to 1985) § 20-7c (b). "Provider" was defined in relevant part as "any *person* who furnishes health care services and is licensed to furnish such services pursuant to chapters 370 to 373,[11] inclusive, 375 to 380,[12] inclusive, and 382[13] of the general statutes."

The court, after hearing and an in camera review of the information in question, shall issue the order requested unless it determines that such disclosure would be detrimental to the physical or mental health of the person or is likely to cause the person to harm himself or another.

"(d) The provisions of this section shall not apply to any information relative to any psychiatric or psychological problems or conditions."

General Statutes § 20-7d provides: "A copy of the patient's health record, including but not limited to, x-rays and copies of laboratory reports, prescriptions and other technical information used in assessing the patient's condition shall be furnished to another provider upon the written request of the patient. The written request shall specify the name of the provider to whom the health record is to be furnished. The patient shall be responsible for the reasonable costs of furnishing the information."

General Statutes § 20-7e provides: "The provisions of sections 20-7b to 20-7d, inclusive, shall not apply to medical records maintained by any agency as defined in section 4-190."

[11] Chapters 370, 371, 372 and 373 of the General Statutes as revised to 1985 respectively address the practice of medicine and surgery, osteopathy, chiropractic and natureopathy.

[12] Chapters 375 through 380 of the General Statutes as revised to 1985 address the practice of podiatry, physical therapy, occupational therapy, alcoholism counseling, midwifery, nursing, dentistry and optometry.

[13] Chapter 382 of the General Statutes as revised to 1985 addresses the practice of pharmacy.

(Emphasis added.) P.A. 83-413, § 1 (b); see General Statutes (Rev. to 1985) § 20-7b (b).

The legislative history of P.A. 83-413 confirms that the act was intended, principally but not exclusively, to provide patients a right to examine and to obtain copies of their health records prior to the initiation of malpractice litigation. See Conn. Joint Standing Committee Hearings, Public Health, Pt. 1, 1983 Sess., p. 170, remarks of Jackie Coleman, assistant executive director of the Connecticut Psychiatric Society; id., pp. 198–99, remarks of Brett Flamm. The legislative history of P.A. 83-413, also reveals that Proposed House Bill No. 5908 was amended to require providers to furnish a copy of a patient's health record, rather than the original health record itself, specifically, but not exclusively, to ensure that the original health record is available to the provider in the event that the patient brings a malpractice action. See 26 S. Proc., Pt. 9, 1983 Sess., p. 3078, remarks of Senator Reginald J. Smith ("because of possible malpractice suits, [providers] should be allowed to keep the original file and . . . turn over a copy to the patient").

In 1986, § 20-7c (b) was amended to delete the reference to "reasonable cost," and to provide instead that "[n]o provider shall charge a patient more than twenty-five cents per page and the cost of first class postage, if applicable, for furnishing a health record pursuant to this subsection." Public Acts 1986, No. 86-43, § 2; see General Statutes (Rev. to 1987) § 20-7c (b).[14] During the discussion on the floor of the House of Representatives of House Bill No. 5217, which was the bill that eventually was enacted as Public Act 86-43, Representative Adele L. Kusnitz remarked, while addressing the cost of duplication of nonpaper portions of a patient's health record,

---

[14] Public Act 86-43, § 1, amended the definition of "provider" in § 20-7b (b) to include opticians licensed pursuant to chapter 381 of the General Statutes.

that "the [health] record *would include slides, micro-scopic slides that were prepared for the pathologist* . . . x-rays, laboratory reports, *slides*, it could be any number of things that are used in making the diagnosis and are part of the permanent record." (Emphasis added.) 29 H.R. Proc., Pt. 2, 1986 Sess., pp. 636, 638–39.

In 1991, § 20-7c was amended to prohibit providers from charging a fee for furnishing health records to patients who request the records in order to apply for benefits under the Social Security Act. Public Acts 1991, No. 91-137, § 2; see General Statutes (Rev. to 1993) § 20-7c. In addition, in order to "eliminate any charges for hospital . . . records for individuals filing social security appeals"; 35 H.R. Proc., Pt. 9, 1992 Sess., p. 2941, remarks of Representative Joseph Courtney; the definition of provider in § 20-7b (b) was amended to include institutions, such as hospitals, that are licensed to furnish health care services pursuant to chapter 368v of the General Statutes. Public Acts 1991, No. 91-137, § 1; see General Statutes (Rev. to 1991) § 20-7b (b), as amended by Public Act 91-137, § 1.

The 1991 amendment to the definition of provider in § 20-7b (b), however, had the unintended consequence of also making hospitals subject to the per page maximum copy fee set forth in § 20-7c (b). See 35 H.R. Proc., supra, p. 2941, remarks of Representative Courtney; Conn. Joint Standing Committee Hearings, Human Services, Pt. 1, 1992 Sess., pp. 56 and 109, remarks of Michael Eisner, counsel for the Connecticut Hospital Association. In 1992, the legislature, therefore, deleted from the definition of provider in § 20-7b (b) the reference to institutions licensed to provide health care services pursuant to chapter 368v, and added to chapter 368v of the General Statutes a separate section addressing patient access to hospital records. General

Statutes § 19a-490b.[15] Public Acts 1992, No. 92-78; see General Statutes (Rev. to 1993) §§ 20-7b (b) and 19a-490b. As originally enacted, § 19a-490b (a), like General Statutes (Rev. to 1991) § 20-7c (b), as amended by Public Act 91-137, § 1, provided in relevant part that "[u]pon a patient's written request, [licensed providers] shall furnish to a patient a copy of the patient's health record, including but not limited to, copies of laboratory reports, prescriptions and other technical information used in assessing the patient's health condition. . . ." Section 19a-490b (a), however, did not incorporate the twenty-five cent maximum per page copy fee provided in § 20-7c (b) but instead imposed a maximum per page copy fee of sixty-five cents. See General Statutes (Rev. to 1993) § 19a-490b (a).

Thus the language, legislative history and circumstances surrounding the enactment of §§ 20-7b through 20-7e and § 19a-490b manifest the legislature's intention that: (1) pathology slides constitute part of a patient's health record; (2) patients be given the right to examine and obtain copies of their hospital health records without first initiating a malpractice action; and (3) hospitals be permitted to retain possession of original health records to ensure, inter alia,[16] that such records are available to the hospital in the event of a malpractice action. This statutory history raises two separate questions: (1) are pathology slides part of a patient's health record; and (2) do pathology slides that cannot be duplicated fall within a hospital's right to retain original health records? We conclude that both of these questions should be answered in the affirmative.

---

[15] See footnote 9 of this opinion.

[16] Section 19a-14-40 of the Regulations of Connecticut State Agencies provides in relevant part: "The purpose of a medical record is to provide a vehicle for: documenting actions taken in patient management; documenting patient progress; providing meaningful medical information to other practitioners should the patient transfer to a new provider or should the provider be unavailable for some reason. . . ."

The first question is relatively easy to resolve. The legislature's intent to preserve reasonable access for a patient to that patient's health records counsels against a narrow construction of "health record." We can conceive of no rational argument to the contrary.

The second question is more difficult. We must reconcile the statutes' express recognition of a patient's right of access to health records with the statutes' failure to address specifically the problem presented if, as in this case, some components of a health record, such as the slides that contain the Pap smear specimens taken from the plaintiff, cannot be duplicated. Because, in our view, the legislature attempted to create a comprehensive network of patient rights, we can discern no basis for extending these rights beyond that which the legislature contemplated. See *Doe* v. *Institute of Living, Inc.*, supra, 175 Conn. 65. We are persuaded, therefore, that patients' rights of access to their health records are limited to those specified by statute. Furthermore, the legislature has manifested an intention that hospitals be permitted to retain possession of original health records in order to ensure, inter alia, that such records are available to the hospital in the event of a malpractice action. We conclude, therefore, that § 19a-490b does not afford patients a right to possession of those components of their hospital records that cannot be duplicated.[17]

---

[17] The plaintiff has called our attention to Public Acts 1998, No. 98-144, which amends § 19a-490b (a) to provide in relevant part: "Upon the written request of the patient, the patient's attorney or the patient's designated health care provider, an institution shall send the original retained tissue slide[s] . . . directly to the patient's designated licensed institution, laboratory or physician. . . ." Public Act 98-144, however, does not take effect until October 1, 1998. Moreover, Public Act 98-144, does not provide that a hospital must furnish original tissue slides directly to a patient, and the legislative history of Public Act 98-144 manifests the legislature's intention that patients not have a right to possession of Pap smear slides. See 41 H.R. Proc., Pt. 11, 1998 Sess., p. 3587, remarks of Representative Carl J. Dickman

Our conclusion finds additional support in the fact that § 19a-490b is not the only statute that governs the obligations of health care providers regarding pathology slides. Pursuant to General Statutes § 19a-36, formerly § 19-13, the commissioner of public health has adopted § 19-13-D32 (b) of the Regulations of Connecticut State Agencies, which provides that "[n]o specimen of excised tissue shall be subjected to pathological examination except by a *physician licensed* to practice in Connecticut who is certified in pathologic anatomy by the American Board of Pathology. No specimen of exfoliated tissue or cells shall be examined except under the supervision and review of a *physician licensed* to practice in Connecticut who either is so certified or has special qualifications acceptable to the commissioner of health for making such examinations." (Emphasis added.) In addition, pursuant to the authority of General Statutes § 19a-14, §§ 19a-14-41 through 19a-14-43 of the Regulations of Connecticut State Agencies address the obligations of licensed physicians with respect to patients' medical records. Licensed physicians are required to "maintain appropriate medical records of the assessment, diagnosis, and course of treatment provided each patient, and such medical records [must] be kept for the period prescribed . . . ." Regs., Conn. State Agencies § 19a-14-41. In addition, the regulations provide that "[u]nless specified otherwise herein, all parts of a medical record shall be retained for a period of seven (7) years from the last date of treatment, or, upon the death of the patient, for three (3) years. . . . *Pathology Slides . . . must . . . be kept for seven (7)*

---

("the provisions of this bill include . . . [P]ap [smear slides]"); id., p. 3584, remarks of Representative Anne McDonald ("There's *no intent ever to give the slides to a patient*—this is why we [amended the bill]—or to his attorney. . . . [Hospitals] will only [be required to] release . . . to another hospital, a licensed laboratory, or a physician in another state. Who presumably will know how to handle these slides." [Emphasis added.]).

*years.* . . ."[18] (Emphasis added.) Regs., Conn. State Agencies § 19a-14-42 (a). Finally, "[i]f a claim of malpractice, unprofessional conduct, or negligence with respect to a particular patient has been made, or if litigation has been commenced, then *all records for that patient must be retained until the matter is resolved.*" (Emphasis added.) Regs., Conn. State Agencies § 19a-14-43.

Thus, the statutory and regulatory scheme that governs the obligations of health care providers with respect to health records recognizes that a hospital has public duties as well as private interests with respect to proper retention of slides for seven years and, if a patient has raised a malpractice claim or malpractice litigation has commenced, until the claim or litigation has been resolved.

We conclude, therefore, that a patient who seeks possession and control of nonduplicable pathology slides contained in the patient's hospital record for litigation related purposes does not have a right to possession of such slides. Because the plaintiff lacks a right to immediate possession of the pathology slides that contain the Pap smear specimens, she is not entitled to replevin of those slides.[19]

---

[18] Moreover, medicare and medicaid regulations provide that participating laboratories "must retain all slide preparations for five years from the date of examination . . . . Documentation for slides loaned or referred for purposes other than proficiency testing must also be maintained. All slides must be retrievable [by the laboratory] upon request." 42 C.F.R. § 493.1257 (g); see 42 C.F.R. § 493.1. Thus, federal regulations prohibit participating laboratories from relinquishing control of Pap smear slides to medicare and medicaid patients for five years.

[19] We do not mean to suggest that there are no circumstances under which a hospital would be obligated to relinquish, for purposes of discovery in litigation, possession of nonduplicable portions of the patient's hospital record. See Practice Book §§ 13-9, 13-10, 13-14 and 13-15, formerly §§ 227, 228, 231 and 232. Nor do we mean to indicate that hospitals have no legal obligation to comply with a patient's written request that the hospital send nonduplicable hospital records directly to another health care provider for

The judgment is affirmed.

In this opinion BORDEN, NORCOTT, KATZ, PALMER and PETERS, Js., concurred.

MCDONALD, J., dissenting. One principle that formerly appeared deeply ingrained in our society and in our law is that one controls one's body. See, e.g., *Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, 505 U.S. 833, 869, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992). In this case, the patient sought to regain control of cells taken from her for medical treatment. This decision now severely restricts the patient's control over her own cells at a time when the advance of genetic science should raise very wide privacy implications.[1] Because she sought these cells for litigation-related purposes, the majority now holds that the patient has no right to immediate possession to parts of her own body. The majority implies, in footnote 19, without deciding, that she may have such a right for purposes reasonably related to her medical care. The majority also intimates that the patient may be required to direct her cells to another medical provider to safeguard them.

In good part, the majority relies on legislation concerning medical records to ascertain a legislative intent to restrict a patient's right to her tissue samples. The majority, however, fails to consider legislation explicitly covering this case. The legislature recently enacted Public Acts 1998, No. 98-144, entitled "An Act Concerning Patient Access to Tissue Slides in Health Records." The act provides that institutions are required to send a patient's tissue slides to the institution, laboratory or

---

purposes reasonably related to the patient's medical care under conditions reasonably designed to preserve the integrity and availability of those records. See footnote 17 of this opinion.

[1] See, e.g., "Scientist Reports First Cloning Ever of Adult Mammal," New York Times, February 23, 1997, p. A1.

physician that the patient designates without restrictions as to the patient's purpose. I, therefore, disagree that the patient may not direct that her tissue slides be sent to her designated physician for litigation-related purposes.

Furthermore, the issue as to whom she may wish to direct the tissue slides was not settled in the papers before the trial judge.[2] In these circumstances, summary judgment was improper. See *Peerless Ins. Co.* v. *Gonzalez*, 241 Conn. 476, 481, 697 A.2d 680 (1997).

Accordingly, I respectfully dissent and would remand this case for a trial on those issues vital to privacy and health.

---

[2] The plaintiff submitted an unrefuted affidavit that she assumed that the Pap smear slides would be forwarded at her request to any new physician whom she selected and that she had ultimate authority over the disposition of the slides. She further stated that she requested that the slides be sent to her new physician for review, which was done, but when her attorneys requested the slides for review of a potential malpractice action, the slides could not be retrieved.