## MARCIA JANICKI *v.* HOSPITAL OF ST. RAPHAEL ET AL.

| Superior Court | Judicial District of New Haven | File No. CV980413077S |
|---|---|---|

Memorandum filed October 4, 1999

*Cella, McKeon & Williams,* for the plaintiff.

*Wiggin & Dana,* for the named defendant et al.

*Smith, Ketaineck, Robertson & Musco,* for the defendant Craig Hutler et al.

## I

## INTRODUCTION

BLUE, J. In 1993, during the Battle of Mogadishu in Somalia, American servicemen repeatedly risked their lives to rescue the bodies of their slain comrades. M. Bowden, Black Hawk Down: A Story of Modern War (Atlantic Monthly Press 1999) pp. 282–85. This is an ancient military tradition, going back to the battle fought over the body of Patroklos on the plains of Troy. It is also a powerful illustration of the symbolic importance that the bodies of the dead have for the hearts and minds of the living. This is a case involving such emotions.

In 1996, the plaintiff, Marcia Janicki, gave birth at the Hospital of St. Raphael (hospital) to a stillborn nonviable fetus that she had carried for approximately nineteen weeks. She alleges that she expressly instructed the hospital not to dissect the fetus and that the hospital performed a dissection anyway. The hospital argues that it was legally entitled to perform a dissection, regardless of the mother's instructions. Each side, unencumbered by binding precedent, claims the high moral ground. The difficult judicial task in this case of first impression is to ascertain the correct legal standards and proceed accordingly.

## II

## THE PROCEDURAL POSTURE OF THE CASE

Janicki commenced this case in May 1998 against the hospital and four physicians. She is the sole plaintiff. Her second amended complaint consists of eleven counts. Only five of those counts, however, are presently before the court. The first three counts are directed against the hospital. The tenth and eleventh counts are directed against her attending physician, Wilfred Reguero. Her factual allegations can be summarized as follows.

In 1996, Janicki, who was pregnant, found that her fetus would not become viable. She went into premature labor and gave birth to the nonviable fetus at the hospital. Although the complaint does not allege the precise developmental stage of the fetus, the parties have informed the court that the fetus had a gestational age of nineteen weeks. Janicki, according to her complaint, "made explicit and clear requests," both before and after her delivery, to Reguero and other agents of the hospital, "that no autopsy or post mortem pathology be performed on her child." Approximately six weeks later, however, she was informed "that a post mortem pathology was performed on her child, which involved, in part, its dissection." She alleges that Reguero ordered this procedure in spite of the specific requests she had given him. (The physician who actually performed the procedure was apparently unaware of Janicki's requests and has not been named as a defendant.) Janicki claims that she has suffered severe emotional distress, accompanied by some physical symptoms, as a result of this experience.

As mentioned, Janicki's first three counts are directed at the hospital. The first count alleges medical malpractice. The second count, which will be discussed in somewhat greater detail below, alleges detrimental reliance.

The third count alleges negligent infliction of emotional distress. Her tenth and eleventh counts are directed at Reguero. The tenth count alleges medical malpractice. The eleventh count alleges negligent infliction of emotional distress.

The motion to strike now before the court was filed by the hospital and Reguero on July 1, 1999. The motion seeks to strike each of the five counts directed against these defendants. It was heard on September 20, 1999. For the reasons stated below, the motion must be granted as to the counts alleging medical malpractice and detrimental reliance and denied as to the counts alleging negligent infliction of emotional distress.

## III

## THE PROBLEM OF CHARACTERIZATION

An important initial problem in this case is one of characterization. Just how should we characterize the subject of the dissection in question? It must be emphasized at once that this issue is distinct from the emotionally laden question of the status of the unborn child in utero. The fetus here had been delivered and had a physical existence (although not, in this case, a living one) separate from that of the mother. Moreover, again unlike the typical unborn child in utero, the fetus here did not (or so it appears from the complaint) have the potential of future life. There is no allegation of any interference with either a pregnancy, a choice to end a pregnancy, or the potential of human life, and case law (and moral argument) concerning those issues can be safely put to one side.

The parties' characterization of the subject of the dissection here seems to have been framed, at least in part, by tactical legal considerations. Thus, at argument, the hospital characterized the subject as "tissue." The hospital analogized it, rather infelicitously, to a tumor

taken from a patient. In the hospital's opinion, "tissue" can be freely subjected to pathological testing regardless of the patient's instructions to the contrary.

Janicki is somewhat more wide ranging in her characterization. Her complaint repeatedly refers to the subject of the dissection as a "child." The emotional appeal that such a characterization might have for a jury aside, this terminology seemingly attempts to capture the legal ground staked out by statutory and case law (discussed below) that the body of a (once living) human being who has died cannot ordinarily be subjected to an autopsy without the consent of the next of kin. At argument, however, Janicki retreated markedly from this characterization and, like the hospital, referred to the subject as "tissue." One tactical consideration here is that she claims, inter alia, medical malpractice and is suing in her personal rather than representative capacity. If the subject here is characterized as "tissue" her claim to medical malpractice (that is, medical malpractice on her) becomes more plausible. A second tactical consideration is that she is claiming negligence, and by characterizing the fetus as her own tissue, she moves a step closer to overcoming the proximity problem (also discussed below).

Neither of these characterizations is appropriate. The fetus here was not a "child" because it never became viable and never had a separate living existence. On the other hand, it was not "tissue," at least in the sense in which that term is usually understood. It was tissue only in the broad sense that it was "an aggregate of cells." Webster's Third New International Dictionary 2399 (1971). That definition, however, is so broad as to include every living thing, including the entire person of a living human being. Webster explains that the term is usually applied to aggregates of cells "that form one of the structural materials out of which the body of a plant or an animal is built up." Id. The term, so defined,

would not be applicable here, since we are dealing with an entire fetus (and one which the mother wished to remain entire) and not just one of the structural materials of a fetus, such as a biopsy sample or a bodily organ. Moreover, the symbolic importance of the fetus is obviously vastly different from that of ordinary tissue. It is unlikely in the extreme that a woman who has carried a fetus for nineteen weeks will view that fetus, stillborn or not, in the same way that she would, for example, view a tumor removed from her body.

For all these reasons, the fetus here cannot be characterized as either "tissue" or a "child." It was a separate physical entity, although not, in this case, a living one. It will help to keep this characterization in mind as the plaintiff's causes of action are reviewed.

## IV

## THE MEDICAL MALPRACTICE COUNTS

With the above discussion in mind, Janicki's claims of medical malpractice can be swiftly dealt with. Janicki is suing in her personal rather than representative capacity. But the hospital, in performing the autopsy, was not performing a medical procedure on her. It was performing a procedure on the fetus, which was, as discussed, a separate physical entity. For reasons already discussed, this was not like a procedure done on tissue (in the ordinary sense of the word) which could, at least in some metaphysical sense, be considered part of the plaintiff. There is no claim that the hospital misdiagnosed her because of a negligently performed pathological test (as might be the case in the hospital's example of a test done on an excised tumor). Janicki claims that she suffered emotional distress because of what the hospital did to the fetus, but that is a separate claim (and one that she in fact brings). Janicki cannot bring a medical malpractice claim under these circumstances because she has not alleged that

she was the recipient of the medical services in question. See *Davis* v. *Margolis*, 215 Conn. 408, 415, 576 A.2d 489 (1990). The motion to strike the first and tenth counts of her second amended complaint must be granted.

## V

## THE DETRIMENTAL RELIANCE COUNT

Janicki's second count, directed only against the hospital, must now be described in somewhat greater detail. She alleges that the hospital provided her with a "Bill of Rights" (the quotation marks are hers). She further alleges that: "[The] Bill of Rights [provides] that a patient can expect the [hospital] to respond reasonably to requests consistent with 'the moral and religious beliefs' of the hospital. Furthermore the Bill of Rights provides that a patient has a right to be advised of all medical research affecting care and treatment and a patient may refuse to participate in that research. The plaintiff relied on these to her detriment." Janicki claims to have suffered the damages already described "[a]s a result of her detrimental reliance."

There is no cause of action technically designated as "detrimental reliance." What Janicki has in mind is an action for promissory estoppel, which is itself a form of breach of contract action. See *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987). This nominal quibble is not itself fatal to her cause. It is clear, however, that Janicki has not adequately pleaded an action of this description, whatever its nomenclature.

The problem largely lies in Janicki's failure to describe exactly how she "relied" on the hospital's asserted promise. (There is a second problem involving the question of just exactly what that promise was, but since that is largely an evidentiary matter, it need not

be discussed here.) One can imagine a scenario in which Janicki relied on the hospital's Bill of Rights in choosing the hospital in the first place. If the hospital were found to have materially breached its promise (assuming that there was a promise), she might have a breach of contract action to recover the sums that she spent in reliance on that promise, particularly the hospital bill. Janicki does not seem to be pursuing such a claim here, however. She claims as damages her emotional distress (and maybe some resultant medical bills), not the hospital bill. A second scenario, perhaps closer to the mark but hard to imagine in operational detail, is that she did something in reliance on the asserted promise during the period of her hospitalization. As mentioned, however, the details of such a hypothetical transaction are difficult to envision, and Janicki certainly hasn't spelled out such details here. It is also hard to imagine what the damages would be in this second scenario, since contract actions typically seek economic damages arising from failed economic arrangements, and that does not appear to be what we have here.

In any event, Janicki's failure to describe her asserted reliance in even the most minimal detail combined with the fact that it is difficult to see just what that reliance could have been is fatal to her second count as it is currently pled. See *Hunt* v. *Friedman,* 6 Conn. App. 720, 722, 507 A.2d 498 (1986). The motion to strike that count must be granted.

## VI

### THE COUNTS OF NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Janicki's third and eleventh counts, directed at the hospital and Reguero respectively, allege negligent infliction of emotional distress. This is the true battleground of the case. Connecticut, of course, has long recognized a cause of action for negligent infliction of

emotional distress. *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978). The question is whether that cause of action applies to the asserted facts of this case. Important issues involving the standard of conduct and proximity must be discussed. Because the hospital and Reguero are represented by the same counsel and submit identical arguments, they will jointly be referred to as "the hospital."

## A

### The Standard of Conduct

The standard of conduct applicable to the hospital must first be addressed. See W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 42, p. 275. As mentioned, the hospital argues that it was legally entitled to perform a dissection on the fetus here, regardless of the mother's express instructions to the contrary. It likens the procedure at issue here to a pathological test performed on a tumor. The hospital asserts, without discussion, that it would be entitled to dissect a tumor in spite of the patient's instructions to the contrary and infers from this supposed right the much more sweeping right to perform the dissection at issue here. In addition to this argument by way of analogy, the hospital claims authority under the aegis of certain Connecticut statutes. It will be helpful to discuss the common law background to the action in question and then turn to the relevant statutes.

### 1

### The Common Law

No reported judicial decision dealing with the unauthorized autopsy of a stillborn child has been discovered by counsel or the court. A number of arguably analogous cases can, however, be found. These cases involve: (1) tort claims involving autopsies of corpses of human

beings who have been born alive; (2) property claims involving tissue specimens (in the ordinary sense of the word tissue); and (3) domestic relations claims involving human preembryos. These analogies will be considered in turn.

a

## Human Corpses

Historically, the law of human corpses has been an oddity. English law for a very long time recognized the anomalous rule that there can be no property in a corpse. Thus, Blackstone stated that, "though the heir has a property in the monuments and escutcheons of his ancestors, yet he has none in their bodies or ashes; nor can he bring any civil action against such as indecently at least, if not impiously, violate and disturb their remains, when dead and buried." 2 W. Blackstone, Commentaries on the Laws of England (1807) p. 429. Under this rule, stealing a corpse, which by definition has no owner, was not a felony. 4 W. Blackstone, supra, p. 236. The "no property" rule remains the law in England today. See *Dobson* v. *North Tyneside Health Authority*, [1997] 1 W.L.R. 596 (C.A. 1996); P.D.G. Skegg, "The No Property Rule and Rights Relating to Dead Bodies," 5 Tort L. Rev. 222 (1997). *Dobson*, however, recognizes that this "bare statement needs some qualification." *Dobson* v. *North Tyneside Health Authority*, supra, 600. First, "persons charged by the law with the duty of interring the body have a right to the custody and possession of it until it is properly buried." (Internal quotation marks omitted.) Id. Second, "[o]nce a body has undergone a process or other application of human skill, such as stuffing or embalming, it seems it can be the subject of property in the ordinary way . . . ." (Internal quotation marks omitted.) Id.

The exception just mentioned gave rise, long ago and far away, to the sole discovered judicial precedent

involving the corpse of a stillborn child. *Doodeward* v. *Spence*, 6 C.L.R. 406 (Australia 1908), is a case peculiar by any standard. Doodeward was an exhibitor, who had in his possession the corpse of a stillborn two-headed child that had been born in New Zealand about forty years previously and preserved in a bottle. When the corpse was exhibited to the public, Spence, an inspector of police, seized the corpse, and Doodeward sued to get it back. The High Court of Australia, in a 2-1 decision, held for Doodeward. All three justices hearing the case recognized the "no property" rule. The majority, however, reasoned that the corpse here had been taken out of the ambit of that rule by the fact "that some—perhaps not much—work and skill had been bestowed . . . upon it, and that it had acquired an actual pecuniary value." Id., 414–15 (opinion of Griffith, C. J.). The *Doodeward* rule probably means that Egyptian mummies and, perhaps, modern embalmed bodies are protected by the larceny laws, but its peculiar facts have little application in the present case.

American courts, especially in the last century, have not been receptive to the "no property" rule. Most courts in this country now recognize that the next of kin have at least a "quasi-property" right in a decedent's body for purposes of burial or other lawful disposition. See *Brotherton* v. *Cleveland*, 923 F.2d 477, 481 (6th Cir. 1991), and authorities cited therein. The reach of this "quasi-property" right is uncertain. See M. Bourianoff Bray, note, "Personalizing Personality: Toward a Property Right in Human Bodies," 69 Tex. L. Rev. 209, 229–31 (1990). What is important, for present purposes, is that American courts have recognized a rule that, "where a nonofficial autopsy is performed without the consent of those who have the quasi-right of property in the corpse . . . the one responsible for such act is liable in damages." 22A Am. Jur. 2d 44, Dead Bodies § 66 (1988).

*Larson* v. *Chase*, 47 Minn. 307, 50 N.W. 238 (1891), is the seminal case on this point. *Larson* holds that there is a judicially recognizable cause of action for the unauthorized autopsy of a human body. It explains that the question of "whether a corpse is property in the ordinary commercial sense" is beside the point when it comes to unauthorized autopsies. Id., 310. "The important fact is that the custodian of it has a legal right to its possession for the purposes of preservation and burial, and that any interference with that right, by mutilating or otherwise disturbing the body, is an actionable wrong." Id. The reasoning and conclusion of *Larson* have been widely accepted. See *Steagall* v. *Doctors Hospital*, 171 F.2d 352, 353 (D.C. Cir. 1948), and authorities cited therein; J. Pearson, Jr., annot., Liability for Wrongful Autopsy, 18 A.L.R. 4th 858 (1982).

Does the *Larson* line of cases apply to the unauthorized dissection of a stillborn child? Although these cases have dealt with the bodies of once living human beings, much of their reasoning is equally applicable to the situation at hand. Thus, it can hardly be doubted that Janicki had at least a "quasi-property" right in the fetus in question. The hospital effectively acknowledged such a right at argument, conceding that it had a responsibility to return the fetus to Janicki for burial. This, however, is a crucial concession under *Larson*, and it is helpful to repeat *Larson*'s reasoning with this concession in mind: "The important fact is that the custodian of it has a legal right to its possession for the purposes of *preservation* and burial, and that any interference with that right, by mutilating or otherwise disturbing the body is an actionable wrong." (Emphasis added.) *Larson* v. *Chase*, supra, 47 Minn. 310. The rights of preservation and burial thus go together, and if one right (that of burial) exists, the other (that of preservation) accompanies it. To some people, of course, the issue of dissection will be inconsequential, but to others

it will be deeply consequential. As a policy matter, the law recognizes the diversity of views on this subject and (except for examinations done by the state medical examiner in cases of suspected crime) allows decisions concerning dissection to be made by the next of kin rather than physicians.

Is the body of a stillborn fetus entitled to less consideration in this regard than the body of a once living human being? A stillborn fetus does not have survivors in the same legal sense that a once living human being has survivors (never having lived, it cannot have an estate) but, as we have just seen, the mother nevertheless retains at least a quasi-property right in the body. The real question that must be addressed is not one of property but one of symbolism. The body of a once living human being is entitled to respect because of its symbolic import, if for no other reason. See J. Robertson, "In the Beginning: The Legal Status of Early Embryos," 76 Va. L. Rev. 437, 447 (1990). It is hardly a stretch to conclude that the body of a stillborn fetus should be entitled to similar respect for the same reason. To address the facts at hand, a mother who has carried a fetus for nineteen weeks can understandably view its body as symbolic not only of the physical presence that she once felt in her own body but also of the hopes and dreams she once had for the future. Symbols are an important, perhaps vital, part of human existence, and all of us, to some extent, live by them. Think of the flag or, for that matter, of the law itself. See Response Delivered on John Marshall Day, 178 Mass. 624, 627–28 (1901) (Holmes, C. J.). It is not improper for the law to recognize the existence and legitimacy of such emotions.

b

Tissue Specimens

The evolving law concerning tissue samples is one of enormous complexity but relatively little applicability to this case. The California Supreme Court has held,

in a controversial decision, that patients do not retain a sufficient property interest in excised cells to support a cause of action for conversion. *Moore* v. *Regents of the University of California*, 51 Cal. 3d 120, 134–47, 793 P.2d 479, 271 Cal. Rptr. 146 (1990), cert. denied, 499 U.S. 936, 111 S. Ct. 1388, 113 L. Ed. 2d 1388 (1991). The Connecticut Supreme Court was confronted with a similar question in *Cornelio* v. *Stamford Hospital*, 246 Conn. 45, 717 A.2d 140 (1998), but found it unnecessary to decide the issue. Id., 50–51 and n.6.

The important points that must be recognized, for present purposes, are that the laws governing human tissues are formed, in large part, "to achieve policy goals"; *Moore* v. *Regents of the University of California*, supra, 51 Cal. 3d 137; and that the policy goals governing the disposition of small groups of cells are not necessarily those that govern the appropriate disposition of a stillborn fetus with a gestational age of nineteen weeks. Whether or not one thinks that a physician may appropriately use a patient's cells for medical research without the patient's permission—the issue in *Moore*—most people would agree that the use of a stillborn fetus for medical research without parental permission raises much graver issues. The fetus, at a minimum, has a much greater symbolic import than a small group of cells, and is entitled to a greater respect because of that import.

c

Preembryos

The law governing the disposition of preembryos (often referred to as "frozen embryos"), articulated in a well-known domestic relations case, is unusually helpful because of its reasoning. In *Davis* v. *Davis*, 842 S.W.2d 588 (Tenn. 1992), cert. denied, 507 U.S. 911, 113 S. Ct. 1042, 122 L. Ed. 2d 352 (1993), the Supreme Court of Tennessee was confronted, in the context of a

divorce case, with the question of the disposition of the cryogenically-preserved product of in vitro fertilization. In deciding the "custody" of the preembryos in question, the court considered the issue of whether the preembryos "should be considered 'persons' or 'property' in the contemplation of the law." Id., 594. The court took an intermediate position. It found that, "the most helpful discussion on this point is found not in the minuscule number of legal opinions that have involved 'frozen embryos,' but in the ethical standards set by The American Fertility Society . . . ." Id., 596. The court found the following ethical discussion; id.; to be particularly persuasive: "Three major ethical positions have been articulated in the debate over preembryo status. At one extreme is the view of the preembryo as a human subject after fertilization, which requires that it be accorded the rights of a person. . . . At the opposite extreme is the view that the preembryo has a status no different from any other human tissue. . . . A third view—one that is most widely held—takes an intermediate position between the other two. It holds that the preembryo deserves respect greater than that accorded to human tissue but not the respect accorded to actual persons. The preembryo is due greater respect than other human tissue because of its potential to become a person and because of its symbolic meaning for many people. Yet, it should not be treated as a person, because it has not yet developed the features of personhood, is not yet established as developmentally individual, and may never realize its biologic potential." Ethics Committee of the American Fertility Society, Ethical Considerations of the New Reproductive Technologies, 46 Fertility and Sterility, No. 3, Sup. 1, pp. 29S–30S (1986), quoted in *Davis* v. *Davis*, supra, 596. Adopting this analysis, the court concluded that preembryos are neither "persons" nor "property," but occupy an intermediate category that entitles them to " 'special respect

. . . .' " *Davis* v. *Davis*, supra, 597. The parents do not have "a true property interest" in the preembryos. Id. "However, they do have an interest in the nature of ownership, to the extent that they have decision-making authority concerning disposition of the preembryos, within the scope of policy set by law." Id.

*Davis* remains the only case attempting "to lay out an analytical framework for disputes between a divorcing couple regarding the disposition of frozen embryos." *Kass* v. *Kass*, 91 N.Y.2d 554, 563, 696 N.E.2d 174, 673 N.Y.S.2d 350 (1998). The analytical framework that it lays out is useful in the context of the instant case. A preembryo, like the fetus in question here (and unlike a fetus in utero) is not contained in the physical body of the mother. Again, like the fetus in question here, it is not a "person" within the meaning of the law. And, most importantly, it is a creation of human reproduction, and occupies a position on the emotional (and perhaps moral) spectrum far removed from that of ordinary tissue.

There are at least two important differences between preembryos and the fetus in question here, but those differences cut in different directions. First, of course, the fetus here was nonviable and stillborn and thus did not have the potential for human life enjoyed by a preembryo. It will be recalled, however, that the potential for human life is only one of two reasons for the "special respect" identified by the Ethics Committee of the American Fertility Society. The other reason for that "special respect" is the fact that preembryos have a "symbolic meaning for many people." (Internal quotation marks omitted.) *Davis* v. *Davis*, supra, 842 S.W.2d 596. That symbolic meaning plainly exists here.

A second difference between preembryos and the fetus in question here adds to the symbolic import at issue in this case. The fetus in question here had a

gestational age of nineteen weeks. A mother who has carried a fetus for nineteen weeks, even one that (as it appears) did not have the potential for life, is likely to develop an emotional attachment that she would not necessarily develop for a preembryo never implanted in her body. The symbolic value of the fetus here is likely, in this sense, to be even more considerable.

For these reasons, the common law should recognize that the fetus in question here, while not a person, was not "property" or "tissue" either. Instead, it occupied an intermediate category in the law entitled to a special respect that would not be given ordinary tissue. The hospital concedes that it had an obligation to turn the fetus over to Janicki for burial. The well established line of authority dealing with unauthorized autopsies on human corpses teaches us that this conceded duty is accompanied by another duty, namely that of preserving the body. The fact that the fetus here was entitled to a "special respect" not accorded ordinary tissue means, at a minimum, that the hospital and its physicians were not entitled to dissect it in the teeth of the mother's express instructions to the contrary.

2

Statutory Law

The hospital invokes two Connecticut statutes, General Statutes §§ 7-60 and 19a-286, in support of its assertion that it was entitled to dissect the fetus in question here in spite of the mother's express instructions to the contrary. The first of these, § 7-60, provides in relevant part: "Fetal death certificates. (a) Each case of fetal death shall be registered and a fetal death certificate shall be filed with the register of vital statistics in the manner required by section 7-48 for filing a birth certificate. A fetus born after a period of gestation of not less than twenty weeks in which there is no attempt at

respiration, no action of heart and no movement of voluntary muscle, shall be recorded as a fetal death."

The second, § 19a-286, provides in relevant part: "Autopsies; consent for. Whenever any person dies and no postmortem examination or autopsy has been ordered pursuant to subsection (b) of section 19a-406, no physician shall conduct or assist in conducting any postmortem examination or autopsy upon the body of such deceased person without first obtaining the consent of whichever one of the following persons, eighteen years of age or older, assumes custody of the body for the purposes of burial: Father, mother, husband, wife, child, guardian, next of kin, friend or any person charged by law with the responsibility for burial. . . . Any person violating any provision of this section shall be fined not more than five hundred dollars."

Both statutes are of somewhat venerable age. Section 7-60 is the more recent of the two. If was first enacted in 1927 as "An Act Concerning the Registration of Stillborn Children." Public Acts 1927, c. 9. That act required the registration "as a still birth" of "a foetus born after a known period of gestation of not less than twenty-eight weeks or measuring at least thirteen and eight-tenths inches from the crown of the head to the sole of the heel . . . ." Id., § 2. The statute was amended in 1951 to apply to fetuses "born after a period of gestation of not less than twenty weeks . . . ." General Statutes (Sup. 1951) § 110b. Section 19a-286 is of earlier origin. It dates from an 1887 act entitled "Post Mortem Examination of Persons Dying in Hospitals." Public Acts 1887, c. 131, § 1735. That act prohibited physicians from performing an autopsy, without consent of the next of kin, upon the body of "any sick or disabled person [who] shall be placed in any hospital in this State for treatment, and before being removed therefrom shall die . . . ." Id. An exception was made for deaths suspected to have been caused by crime. Id. The statute has since

been expanded by the legislature to apply to the bodies of all persons dying in the state, again excepting deaths suspected to have been caused by crime and other unusual circumstances not involved here. See General Statutes § 19a-406.

It is common ground that neither of these statutes is directly applicable to the facts of this case. Thus, § 7-60 is not applicable because the fetus here was not born "after a period of gestation of not less than twenty weeks" (the gestational period was nineteen weeks here); and § 19a-286 is not applicable because no "person" has died (the fetus, never having lived, could not be considered a "person" within the meaning of the statute). The question is whether these statutes preempt the field. The hospital, as I understand it, argues that the legislature, by enacting statutes with respect to "persons" and fetuses born after gestational periods exceeding twenty weeks, has chosen to leave cases outside of these categories unregulated. Thus, in the case of a fetus with a gestational age of nineteen weeks—the case here—the hospital argues that it has a legally unfettered discretion to perform a dissection, regardless of explicit parental instructions to the contrary. This argument cannot be sustained on the basis of the statutes in question here.

The negative inference that the hospital wishes to draw from § 19a-286 is plausible but not ultimately persuasive. It is at least arguable that, by requiring consent for autopsies performed on the bodies of "persons," the legislature intended to leave physicians free to perform unconsented-to dissections on the bodies of all stillborn children (who would not be "persons" under the statute). There are, however, at least two significant problems with this argument, and, as it turns out, it is an argument that the hospital did not embrace at the hearing. It is, in the first place, exceedingly unlikely that the legislature ever considered the question of stillborn

dissections when it enacted the statute in 1887. This is not a case like *Cornelio*, where the legislature has enacted a comprehensive web of modern statutes to regulate a medico-legal problem. We have here, instead, a single, century-old statute that simply does not address the problem at hand. In the second place, a conclusion that § 19a-286 preempts the field would allow physicians to conduct dissections of all stillborn fetuses, including fully developed nine-month fetuses who have died just prior to birth, against the most express parental instructions to the contrary. There is no evidence that the legislature either considered or intended such a scenario.

The hospital, as mentioned, does not claim this particular ground and conceded at argument that, if the fetus in question had a gestational age exceeding twenty weeks and was thus regulated by § 7-60, consent (or at least the absence of an express parental prohibition) would be required for a dissection. By conceding this, however, the hospital has conceded that § 19a-286 does not preempt the field when it comes to stillborn births. And it is difficult to see how § 7-60 enhances the hospital's position in any meaningful way, since that statute has nothing whatsoever to do with autopsies. Section 7-60 is merely a statute governing registration. If the legislature in enacting § 7-60, had wished to create a statutory rule that fetal autopsies could be done without parental consent prior to a specified gestational age but only with parental consent after that gestational age, it could surely have done so. The example of § 19a-286, had the legislature wished to follow that example, was already on the books. The legislature, however, did nothing of the sort. There is simply no indication that the legislature either considered or intended to address the issue of fetal autopsies when it enacted § 7-60. Because that statute is silent on the subject and, as mentioned, § 19a-286 has been effectively conceded,

the legal standards regulating the conduct in question here must, as a practical matter, be those articulated by the common law.

## 3

### The Standard of Conduct Articulated

With this discussion in mind, the standard of conduct legally applicable to the hospital can now be articulated. The standard is defined by the common law and is unaltered by §§ 7-60 and 19a-286. It is clear from the respective common law doctrines governing the autopsies of human corpses and the custody of preembryos that a stillborn fetus may have significant symbolic importance to the mother. This will not be the case in all instances, but it will plainly be the case in some. This symbolic importance will not necessarily depend on whether the fetus in question has attained viability, and, as a matter of human emotion, it will not necessarily depend on the attainment of a specific gestational age of twenty weeks. It is essential that the law recognize the diversity of parental views on this subject.

Because of this diversity of views, it would be inappropriate, at least in the context of the present case, to mandate that a physician obtain affirmative parental consent in order to perform a fetal dissection. It is, however, appropriate to mandate that, in cases not involving the chief medical examiner, a fetal dissection cannot be performed in defiance of express maternal *prohibition*. By expressly prohibiting a dissection, the mother has effectively indicated that she considers the fetus to have significant symbolic importance. Her wishes are entitled to the law's respect. Janicki has appropriately alleged a breach of the applicable standard of conduct.

## B

## Proximity

"[T]he legal construct of proximate cause serves to establish how far down the causal continuum tortfeasors will be liable for the consequences of their actions." *First Federal Savings & Loan Assn. of Rochester* v. *Charter Appraisal Co.*, 247 Conn. 597, 604, 724 A.2d 497 (1999). In the case of actions for "bystander emotional distress," the Connecticut Supreme Court has recognized as a policy matter that, "the bystander's emotional injury must be caused by the contemporaneous sensory perception of the event or conduct that causes the injury . . . or by viewing the victim immediately after the injury causing event if no material change has occurred with respect to the victim's location and condition." (Citations omitted.) *Clohessy* v. *Bachelor*, 237 Conn. 31, 52, 675 A.2d 852 (1996). The Supreme Court has also held that, "a bystander to medical malpractice may not recover for emotional distress . . . ." *Maloney* v. *Conroy*, 208 Conn. 392, 393, 545 A.2d 1059 (1988). Janicki here witnessed neither the negligent conduct complained of nor its immediate aftermath. Her complaint indicates that she learned of the dissection in question about six weeks later. Does this fact preclude her recovery as a matter of law?

The issue here is not one of forseeability. A jury could plainly find emotional harm to Janicki forseeable, given the facts alleged. The question is one of proximity. "Even where harm was forseeable, this court has found no duty when the nexus between a defendant's negligence and the particular consequences to the plaintiff was too attenuated." *First Federal Savings & Loan Assn. of Rochester* v. *Charter Appraisal Co.*, supra, 247 Conn. 605. The hospital claims that the bystander cases, described above, should be invoked to find the nexus too attenuated here. There is some support in the case

law of other jurisdictions for this position. See *Washington* v. *John T. Rhines Co.*, 646 A.2d 345 (D.C. 1994), and authorities cited therein. This view, however, cannot be squared with the policy considerations underlying the law of causation.

The problem with the hospital's argument is that it fails to distinguish between primary and secondary victims of negligence. This is an important distinction, usefully articulated by the House of Lords in *Page* v. *Smith*, [1996] 1 App. Cas. 155, 184 (H.L. 1995). The restrictions placed on recovery in the bystander line of cases are on secondary victims. Thus, in the typical motor vehicle case, a defendant negligently causes an accident and injures the primary victim. A plaintiff who claims emotional distress resulting from the accident but is not herself physically injured is a secondary victim. The same is true in the *Maloney* scenario, where the primary victim has been injured by medical malpractice and a secondary victim claims emotional distress. "In claims by secondary victims the law insists on certain control mechanisms, in order as a matter of policy to limit the number of potential claimants." Id., 197. The reasons for this are obvious. If I negligently injure you in a motor vehicle accident, I am undoubtedly liable to you, but to hold me additionally liable to the numerous people who would be distressed at your injury would be excessively burdensome. This consideration provides the justification for the control mechanisms set forth in *Clohessy*. *Clohessy*'s express concern is that, without such mechanisms, there would be "unlimited liability." *Clohessy* v. *Bachelor*, supra, 237 Conn. 50. These control mechanisms, however, "have no place where the plaintiff is the primary victim." *Page* v. *Smith*, supra, 197.

Consider the consequences of a contrary rule in the context of the present case. The bystander rule operates

to reduce the universe of potential plaintiffs to a manageable number of persons. In the typical case of an automobile accident, that number will include the person or persons physically injured by the accident plus bystanders who fall into *Clohessy*'s parameters. Here, however, the number of possible plaintiffs would be reduced to zero.

Unlike the primary victim of a motor vehicle accident or the victim of medical malpractice in *Maloney*, the fetus in question here, never having lived, could not sue, either directly or through an estate, for the breach of the standard of conduct that has occurred. The fetus, of course, is not the primary victim at all. The primary victim is Janicki, for it is she who expressly prohibited the dissection in question and it is she who will be most directly affected by news that the dissection was performed in spite of her express prohibition. This is not a case of "distress at witnessing some peril or harm to another person . . . ." W. Prosser & W. Keeton, supra, § 54, p. 365. The person who has been harmed is not "another person" but Janicki herself. The control mechanisms of *Clohessy* do not apply to her.

For these reasons, Janicki has adequately pleaded a cause of action for the negligent infliction of emotional distress. Any questions of causation raised by the facts in question are for the jury.

## VII

## CONCLUSION

For the reasons explained above, the motion to strike is granted as to the first, second, and tenth counts of the second amended complaint. It is denied as to the third and eleventh counts.