No. 22-0439 – *SER Charleston Area Medical Center, Inc. v. Thompson, et al*

WOOTON, J., dissenting:

**FILED**

**June 12, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

I dissent to the majority's extension of the Medical Professional Liability Act (hereinafter "MPLA") to acts of common, ordinary negligence merely because they involve a health care provider. This Court has previously determined that a hospital's negligence as to postmortem care and handling does not implicate the MPLA because such postmortem remains are not "patients" as defined therein. *See* Syl. Pt. 1, *Ricottilli v. Summersville Mem'l Hosp.*, 188 W. Va. 674, 425 S.E.2d 629 (1992). Here, because the postmortem remains fortuitously involve a fetus whose mother was contemporaneously rendered care by the hospital, the majority determines that the mother is the "patient" necessary to trigger the MPLA. Although the majority painstakingly attempts to pigeon-hole the cause of action into the MPLA's definitions, I believe such an expansion of the MPLA runs contrary to our precedent and the widely understood nature of such claims; therefore, I respectfully dissent.

The negligent mishandling of a corpse is well-established cause of action that does not bear any of the hallmarks of medical professional liability such as to trigger the special requirements of the MPLA. Handling and transfer of postmortem remains, while deserving of professionalism and the utmost care, simply does not implicate the type of negligent "health care services" the MPLA was designed to address. Whether petitioner Charleston Area Medical Center (hereinafter "CAMC") was negligent in its handling of

1

A.C.L.'s fetal remains by allowing the remains to be placed, unprotected, in a vehicle is a matter that requires no expert testimony. It requires only the judgment of a lay person, using his or her ordinary understanding of the concept of "reasonable care." It is, by any measure, a tragic, yet "ordinary" tort claim sounding in simple negligence which merely happens to involve a health care provider in addition to a funeral home. In terms of the claim of negligent mishandling, the allegations against both CAMC and the funeral home are effectively the same, i.e. the negligent facilitation of and transport of the unprotected remains in a vehicle containing both items which threatened the safety of the remains and an unauthorized individual. Yet, the majority has determined as to CAMC alone, the claim necessitates the extensive, specialized handling required under the MPLA.

In a nearly identical case, the Michigan Court of Appeals described precisely why such a cause of action does not bear any indicia of a medical professional liability action. In *Urbanowicz v. Trinity Health-Michigan*, No. 354970, 2021 WL 5021769 (Mich. Ct. App. Oct. 28, 2021), the mother of a "stillborn child" brought an action for mishandling a corpse against the hospital where the child was delivered; the hospital was allegedly to have negligently provided the afterbirth, rather than the remains, of the stillborn child to a funeral home for cremation. *Id*. at *1. The trial court dismissed for violation of the statute of limitations provided under Michigan's medical malpractice act. *Id*. The Court of Appeals reversed, explaining why such a cause of action did not sound in medical malpractice:

2

In this case, plaintiff Tricia gave birth at the hospital and there was a contractual duty for the hospital to render professional healthcare services to her as she gave birth. Therefore, the hospital shared a professional relationship with plaintiff Tricia. And the parties do not dispute that the hospital, doctors, and employees who were rendering care to plaintiff Tricia were capable of committing medical malpractice. However, *the reasonableness of the hospital's actions in determining where and how to store plaintiffs' stillborn child and how to appropriately catalog whether the human remains were properly delivered to a third-party funeral home does not require medical knowledge or medical judgment*. In other words, such storage and delivery policies do not require expert testimony. They are within the knowledge of any layperson who is familiar with administrative tasks.

The hospital argues that care for a stillborn child is not something that a layperson would know how to perform. However, plaintiffs are not claiming that the hospital's medical care was negligent, but rather that the hospital negligently cataloged and transferred the wrong human remains to the funeral home. Resolving these allegations does not require specialized medical knowledge that the jury would only be able to understand as explained by an expert.

*Id.* at *2 (emphasis added). Other courts have come to the same conclusion under similar facts. *See Kelly v. Brigham & Women's Hosp*., 745 N.E.2d 969, 975 (Mass. App. Ct. 2001) (observing that negligent mishandling of a corpse is not a "medical malpractice" case); *Dillard v. Parkland Hosp*., 136 S.W.3d 16, 21 (Tex. App. 2002) (finding that father did not have "health care liability claim" for negligent mishandling of his son's corpse); *Janicki v. Hosp. of St. Raphael*, 744 A.2d 963, 966 (Conn. Super. Ct. 1999) (finding that claim of mishandling of stillborn fetus did not constitute medical malpractice case); *Bauer v. N. Fulton Med. Ctr., Inc.*, 527 S.E.2d 240, 242 (Ga. Ct. App. 1999) (finding medical

3

malpractice statute inapplicable as it "governs medical procedures and services offered to living patients").

This is, in fact, the same conclusion to which this Court came nearly thirty years ago in *Ricottilli*. The plaintiff in *Ricottilli* alleged negligence against a health care provider in connection with her deceased daughter's autopsy. The Court concluded this action did not sound in medical malpractice based on the MPLA's definition of "patient"— a definition which the majority admits has not changed in the interim. The *Ricottilli* Court held: "By definition, a deceased individual does not qualify as a 'patient' under the Medical Professional Liability Act ('Act'), West Virginia Code §§ 55-7B-1 to -11 (Supp. 1992), and therefore cannot be the basis for a cause of action alleging medical professional liability pursuant to the Act." *Id.*, syl. pt. 1.

The majority quickly and tersely distinguishes this case—*not because the allegations, cause of action, or underlying conduct is substantially different*—but simply because the decedent in *Ricottilli* was a "*prior patient.*" (Footnote omitted). In other words, because the decedent in *Ricottilli* entered the hospital alive and was given a patient identification and registration, the decedent was the "patient" to be evaluated under the MPLA's definition. However, because CAMC does not provide a stillborn fetus a separate patient identification or registration, the majority concludes that A.C.L.'s mother— respondent Angela Lester—is the relevant "patient" who triggers the application of the MPLA.

Essentially then, the majority dispenses with this case on the basis of how CAMC administratively manages patient registration and fetal deaths. Ostensibly, under the majority's analysis, had A.C.L. been born alive for even a moment and/or been provided patient identification and registration by CAMC and the same subsequent alleged mishandling of his remains occurred, A.C.L. would qualify as a "deceased prior patient" as in *Ricottilli* and the MPLA would be deemed inapplicable. It is the fortuity of A.C.L. being a stillborn fetus necessitating his mother's commensurate hospitalization for delivery that provides the majority an alternate "patient" to trigger the MPLA. CAMC's care, custody, and handling of his postmortem remains is, in all other respects, identical to any other deceased individual.

Once the majority determined that Mrs. Lester—and not A.C.L.—was the relevant "patient," it had little difficulty finding that the handling of A.C.L.'s remains constituted "health care services" rendered "on behalf of" Mrs. Lester. However, even assuming Mrs. Lester is the "patient" whose "health care" is at issue, the very definition of "health care services" reveals how ill-fitting the MPLA is to this cause of action. The majority utilizes West Virginia Code § 55-7B-2(e) (2022) as the relevant statutory definition which defines "health care," in part, as

> (2) Any act, service, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider . . . for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement, *including, but not limited to, staffing, medical transport, custodial care, or basic care, infection control, positioning, hydration, nutrition, and similar patient services*[.]

5

(emphasis added). These specifically identified items are the type of care and services requiring some semblance of medical judgment and entail a facility or provider's rendering or ability to render appropriate care relative to a patient's condition. Staffing, transport, custodial issues all directly impact the adequate provision of more specific, direct health care to patients such as infection control, positioning, hydration, nutrition, and the like.[1] The post-mortem handling of fetal remains simply does not comport with the specifically identified types of patient care services that constitute "health care" per the statutory definition.

This case once again raises the concern I expressed in *State ex rel. W. Virginia Univ. Hosps., Inc. v. Scott*, 246 W. Va. 184, 204, 866 S.E.2d 350, 370 (2021) (Wooton, J., concurring, in part, and dissenting, in part) about expanding the reach of the MPLA to the types of claims which "were not the genesis of the MPLA's remedial efforts and are undeserving of the special protections the MPLA affords." In fact, in its eagerness to extend the MPLA to virtually any claim involving a health care provider, the majority boldly extends the MPLA to a purported claim in this case it can neither specifically

---

[1] Nor does postmortem handling of remains reasonably fall within the catch-all term "similar patient services" because it is entirely dissimilar from the delineated patient care services which are specifically identified. As the Court has explained, broad statutory terms are given further refinement by the words which surround them under the canon of statutory construction known as "*noscitur a sociis*." *See Murray v. State Farm Fire & Cas. Co*., 203 W. Va. 477, 485, 509 S.E.2d 1, 9 (1998) ("The phrase *noscitur a sociis* literally means 'it is known from its associates,' and the doctrine implies that the meaning of a general word is or may be known from the meaning of accompanying specific words.").

describe nor verify has been viably pled—a claim which was not even subject of petitioner's writ. Without first deciding such a claim has actually been pled—and disavowing a conclusion either way—the majority finds that any "privacy" claim that can be found in the subject complaint also falls within the ambit of the MPLA. To affirmatively resolve the issue of the MPLA's applicability to a purported claim that *might* later be found to have been sufficiently pled is entirely advisory in nature. *See Harshbarger v. Gainer,* 184 W. Va. 656, 659, 403 S.E.2d 399, 402 (1991) (criticizing advisory opinion which purported to resolve issue "that was at most a mere contingent possibility[]" lacking "present controversy" and "present necessity"); *see also State ex. rel. Perdue v. McCuskey*, 242 W. Va. 474, 479, 836 S.E.2d 441, 446 (2019) ("The Treasurer's petition presents a hypothetical controversy that we will not resolve with an advisory opinion." (footnote omitted)).

While the reach of the MPLA may indeed be broad, it is not limitless. If the Legislature's intent were to require the MPLA's application to virtually any case filed against a health care provider regardless of the nature of the underlying allegations, it would scarcely have bothered to create definitions at all. Respondents' allegations of negligent mishandling of A.C.L.'s remains fall squarely into this Court's holding in *Ricottilli*; the majority's creation of elastic definitional boundaries in the MPLA undermines its essential purpose.

Accordingly, I respectfully dissent.

7