# MICHELLE DILIETO ET AL. *v.* COUNTY OBSTETRICS AND GYNECOLOGY GROUP, P.C., ET AL.

## (SC 16698)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.

Argued October 24, 2002—officially released July 29, 2003

*William F. Gallagher*, with whom was *Hugh D. Hughes*, for the appellant (substitute plaintiff).

*Frank H. Santoro*, with whom, on the brief, were *Paul T. Edwards* and *Joyce A. Lagnese*, for the appellee (defendant Thomas P. Anderson).

*Jeffrey R. Babbin*, with whom was *Victor A. Bolden*, for the appellee (defendant Yale University School of Medicine).

*Opinion*

VERTEFEUILLE, J. The dispositive issue in this appeal is whether the trial court improperly interpreted General Statutes § 52-184c to require the exclusion of the testimony of an expert witness proffered by the plaintiff trustee in bankruptcy, Michael J. Daly.[1] The plaintiff appeals from the judgment of the trial court in favor of the defendants Yale University School of

[1] This case originally was brought by the named plaintiffs, Michelle DiLieto (DiLieto) and her husband, Robert DiLieto, both of whom subsequently filed petitions for bankruptcy pursuant to 11 U.S.C. § 701 et seq. Daly thereafter was substituted as plaintiff. References herein to the plaintiff are to Daly.

Medicine (Yale) and Thomas P. Anderson, a physician, after a jury trial in this medical malpractice action.[2]

On appeal, the plaintiff claims that the trial court improperly: (1) determined that the plaintiff was not entitled under General Statutes § 20-7c to obtain Michelle DiLieto's pathology slides; (2) instructed the jury that the plaintiff had judicially admitted certain facts alleged in both the initial complaint and a subsequent amended complaint; (3) excluded the testimony of the plaintiff's expert witness because the proffered witness was not a "health care provider" licensed in Connecticut; and (4) precluded DiLieto from testifying as to what course of treatment she might have chosen had she been informed that her condition was possibly benign. We conclude that the trial court's exclusion of the testimony of the plaintiff's expert witness was improper, and, accordingly, we reverse the judgment of the trial court and order a new trial against Yale.[3] We address the plaintiff's three remaining issues on appeal because they are likely to arise again in the new trial.

The jury reasonably could have found the following facts. In February, 1995, DiLieto sought medical attention because of intense and prolonged bleeding during her menstrual period. DiLieto consulted the defendant

[2] In her initial complaint, DiLieto had alleged that the defendants Yale and Yale-New Haven Hospital were vicariously liable for the negligence of their physician employees, Vinita Parkash, Babak Edraki and Peter E. Schwartz. The plaintiff withdrew the claim against Yale-New Haven Hospital shortly before the trial began. The complaint also named Scott Casper, a physician, and his employer, the County Obstetrics and Gynecology Group, P.C., as defendants. The jury was unable to reach a verdict as to Casper and County Obstetrics and Gynecology Group, P.C., and, accordingly, a retrial was ordered as to those defendants. We refer herein to the individual defendants by name and references to "the defendants" are to Yale and Anderson jointly.

[3] We also conclude that only the plaintiff's fourth claim implicates Anderson's minimal role in this case. We address the claim against Anderson in part V of this opinion.

Scott Casper, an obstetrician-gynecologist employed by the named defendant, County Obstetrics and Gynecology Group, P.C. (County Obstetrics). After a noninvasive mode of treatment proved ineffective, Casper recommended that DiLieto undergo a diagnostic dilation and curettage (D & C).

After the D & C was performed, a sample of DiLieto's uterine tissue was sent to Anderson, a pathologist, at Waterbury Hospital. Anderson examined the tissue grossly and microscopically, and consulted with his colleagues. He diagnosed the specimen as a "florid endometrial stromal proliferation *consistent with* a low grade endometrial stromal sarcoma."[4] (Emphasis added.) Endometrial stromal sarcoma is a rare and potentially deadly malignancy. Anderson, who had no contact with DiLieto and had no involvement in the case beyond his review and analysis of the tissue, signed a written report containing his diagnosis and submitted a copy of the report to Casper.[5]

After Casper received the diagnosis over the telephone from another pathologist in Anderson's group, Casper contacted DiLieto and asked that she come to his office to discuss the diagnosis with him in person. Casper, who characterized Anderson's diagnosis as being a definitive finding of malignancy, explained to DiLieto that the pathologist report indicated that she had a stromal sarcoma, a rare uterine malignancy. Cas-

---

[4] Testimony was elicited at trial that an "endometrial stromal proliferation" involves the growth of atypical cells within the lining of the uterus (endometrium). An endometrial stromal proliferation can be either an endometrial stromal sarcoma (malignant) or an endometrial stromal nodule (benign), the sarcoma type being more common than the nodule type. See footnote 8 of this opinion. The diagnosis of endometrial stromal proliferation in the present case, therefore, was inconclusive as to whether the condition was malignant or benign.

[5] A review of the record indicates that Anderson did not submit a written report until after Casper had arranged for the slides and tissue block to be sent to Yale's pathologists for analysis.

per further explained that the general treatment for the malignancy involved total hysterectomy and bilateral salpingo-oophorectomy, which consists of the removal of the uterus, ovaries and fallopian tubes. Additionally, Casper told DiLieto that her pathology slides would be sent to Yale-New Haven Hospital for further review.

Casper consulted with Peter E. Schwartz, a professor of obstetrics and gynecology at Yale, who asked Yale's pathologists to review DiLieto's slides. Yale professors Maria Luisa Carcangiu and Vinita Parkash, both of whom were pathologists, reviewed the slides and agreed that they evidenced endometrial stromal proliferation consistent with endometrial sarcoma. Parkash subsequently presented DiLieto's case to the Yale tumor board, which met once a week and was made up of attending physicians from the divisions of gynecologic oncology, gynecologic pathology and radiation oncology. The tumor board generally attempts to reach a consensus and make recommendations for the appropriate treatment in each case presented to the board.

The tumor board agreed with Anderson's assessment and the independent assessments of Parkash and Carcangiu, but added a third possible condition to the differential diagnosis.[6] The tumor board determined that special stains would be necessary in order to distinguish between stromal proliferation and a benign condition of the underlying uterine muscle tissue (myometrium) known as "highly cellular leiomyoma." The ordered stains, however, could not have distinguished between

[6] Pathologists create a short list of possible conditions once they have examined and analyzed pathology slides. This is known as a "differential diagnosis."

benign and malignant stromal proliferation.[7] Parkash and Carcangiu viewed the specially stained slides and noted that the tumor fragments did not stain positively for a substance called desmin, which is typically found in smooth muscle tissue. The pathologists determined that the slides supported Anderson's original diagnosis of an endometrial stromal proliferation consistent with endometrial stromal sarcoma.[8]

Schwartz subsequently advised Casper of the pathologists' findings and recommended a hysterectomy, a bilateral salpingo-oophorectomy and a pelvic lymph node dissection[9] because of the possible spread of the malignancy to the lymph nodes. In May, 1995, Casper performed surgery on DiLieto and removed her uterus, fallopian tubes and ovaries. Casper then ordered a frozen section analysis[10] of the excised tissue. The frozen tissue analysis did not reveal any evidence of sarcoma.

Casper then had Schwartz and Babak Edraki, a surgeon, summoned to the operating room to perform the lymph node sampling, which involved the removal of two of DiLieto's lymph nodes. Parkash later examined the excised nodes along with the hysterectomy sample and concluded that the lesion was likely benign.

[7] Witnesses for both the plaintiff and the defense testified that the primary means of distinguishing between a malignant and benign stromal proliferation is to examine the "margins" (edges or borders) of the tumor to determine the extent of the tumor's penetration into surrounding healthy tissue. The margins of a sarcoma appear as finger-like projections that have infiltrated the tissues around it. A benign nodule would likely have a discrete boundary without signs of penetration into the surrounding tissues.

[8] Witnesses for both sides testified that proliferations of the endometrial stroma are extremely rare. A florid proliferation is, however, ten times more likely to be an endometrial stromal sarcoma (malignant) than an endometrial stromal nodule (benign).

[9] The sampling of the lymph nodes involves their removal and dissection for analysis.

[10] Frozen section analysis involves the flash freezing of tissue and then slicing it thinly for viewing under a microscope.

As a result of the total hysterectomy, DiLieto experienced the symptoms of menopause, including estrogen deficiency. After DiLieto experienced other symptoms following the surgery, including pelvic discomfort and pain, she sought further treatment from a neurologist and a pathologist in the Boston, Massachusetts area. The pathologist reviewed DiLieto's pathology slides and concluded that DiLieto's uterine tissue sampled during the original D & C likely implicated a benign leiomyoma or tumor. The pathologist submitted his findings to DiLieto's family practice physician, who advised DiLieto that she had not had cancer.

DiLieto then brought this action against Casper and County Obstetrics, against Yale as the employer of Parkash, Edraki, and Schwartz, and against Anderson. See footnote 2 of this opinion. DiLieto claimed, inter alia, that: Anderson had diagnosed her condition improperly and negligently had failed to inform Casper that her condition was possibly benign; Casper and County Obstetrics negligently failed to diagnose her condition, failed to communicate adequately with Yale, and negligently allowed the lymph node surgery to continue despite the lack of evidence of malignancy; and Parkash, Schwartz and Edraki had diagnosed her condition inaccurately and that their failure to communicate with each other and DiLieto led to the unnecessary performance of the lymph node dissection. The jury returned a verdict for Anderson and Yale, finding that neither had violated the applicable standard of care. The jury was unable to reach a verdict regarding Casper and County Obstetrics. The plaintiff moved for a new trial against all of the defendants and Casper moved for judgment in his favor. The trial court denied both motions and rendered judgment for Anderson and Yale

and ordered a retrial against Casper and County Obstetrics. This appeal followed.[11]

## I

The plaintiff first claims that the trial court improperly interpreted General Statutes § 52-184c[12] to exclude

[11] The plaintiff appealed to the Appellate Court and we transferred the case to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[12] General Statutes § 52-184c provides: "(a) In any civil action to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, in which it is alleged that such injury or death resulted from the negligence of a health care provider, as defined in section 52-184b, the claimant shall have the burden of proving by the preponderance of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

"(b) If the defendant health care provider is not certified by the appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself out as a specialist, a 'similar health care provider' is one who: (1) Is licensed by the appropriate regulatory agency of this state or another state requiring the same or greater qualifications; and (2) is trained and experienced in the same discipline or school of practice and such training and experience shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim.

"(c) If the defendant health care provider is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a 'similar health care provider' is one who: (1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty; provided if the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a 'similar health care provider'.

"(d) Any health care provider may testify as an expert in any action if he: (1) Is a 'similar health care provider' pursuant to subsection (b) or (c) of this section; or (2) is not a similar health care provider pursuant to subsection (b) or (c) of this section but, to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in

the testimony of the plaintiff's expert witness, John Shepherd, a physician from England who is not a licensed physician in Connecticut. Shepherd was to have testified, inter alia, that Casper and Schwartz breached the prevailing standard of care when they failed to run imaging tests and other diagnostic procedures in addition to the special stains. The defendants respond that the trial court properly precluded Shepherd from testifying because he was not "a health care provider" pursuant to § 52-184c, which incorporates by reference the definition of health care provider found in General Statutes § 52-184b.[13] Section 52-184b defines health care provider as a person licensed to provide health care in Connecticut. We agree with the plaintiff.

The following additional facts and procedural history are relevant to the resolution of this claim. The plaintiff disclosed eleven experts in addition to DiLieto's treating physicians. Shepherd, one of these experts, was a London-based gynecological oncologist who had been trained, in part, in the United States. Prior to trial, the defendants moved to exclude Shepherd's expert testimony, contending that he did not meet the criteria required under § 52-184c. The trial court granted the motion to exclude on the basis that § 52-184c incorporates the definition of "health care provider" set forth in § 52-184b (a), which provides that a health care provider means a person "licensed by this state to provide health care or professional services . . . ." Shepherd therefore did not testify at trial.

a given field of medicine. Such training, experience or knowledge shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim."

[13] General Statutes § 52-184b (a) provides: "For the purposes of this section, 'health care provider' means any person, corporation, facility or institution licensed by this state to provide health care or professional services, or an officer, employee or agent thereof acting in the course and scope of his employment."

We first set forth the applicable standard of review. Generally, "[t]he trial court . . . has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *Grondin* v. *Curi*, 262 Conn. 637, 648, 817 A.2d 61 (2003). We determine, however, that the dispositive issue in this case is the trial court's construction of § 52-184c. Accordingly, our review of this issue of statutory interpretation is plenary. Id., 649; *State* v. *Valedon*, 261 Conn. 381, 385–86, 802 A.2d 836 (2002); *Connor* v. *Statewide Grievance Committee*, 260 Conn. 435, 438–39, 797 A.2d 1081 (2002).

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, [231 Conn. 418, 431, 650 A.2d 557 (1994)]. In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Bender* v. *Bender*, [258 Conn. 733, 741, 785 A.2d 197 (2001)]. Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing

so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the language, broadly understood, are directly relevant to the meaning of the language of the statute.

"This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain meaning of the language, namely, the meaning that, when the language is considered without reference to any extratextual sources of its meaning, appears to be *the* meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning." (Emphasis in original; internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 577–78, 816 A.2d 562 (2003).

We begin our analysis with an examination of the language of the statute. Section 52-184c addresses the standard of care and the qualifications of testifying experts in medical malpractice actions.[14] "Section 52-184c sets forth four distinct, yet closely intertwined, subsections. Section 52-184c (a) requires the plaintiff to prove, by a preponderance of the evidence, that the defendant breached the prevailing professional standard of care for that health care provider. . . . That subsection then defines the prevailing professional standard of care for a given health care provider [as]

---

[14] "[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, expert testimony is required to establish both the standard of care to which the defendant is held and the breach of that standard." (Internal quotation marks omitted.) *Gold* v. *Greenwich Hospital Assn.*, 262 Conn. 248, 254–55, 811 A.2d 1266 (2002).

that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent *similar health care providers*. . . . General Statutes § 52-184c (a). . . .

"[S]ubsection (d) of § 52-184c prescribes qualifications for expert witnesses in negligence actions against health care providers. Under that subsection, there are two ways for an expert to qualify to testify in an action against a specialist. The proposed expert may testify against a specialist if he or she is a similar health care provider pursuant to subsection . . . (c) . . . . General Statutes § 52-184c (d). Alternatively, if the expert does not satisfy the requirements of subsection (c), he still may testify if he, to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. . . . General Statutes § 52-184c (d)." (Emphasis in original; internal quotation marks omitted.) *Grondin* v. *Curi*, supra, 262 Conn. 650–51.

Section 52-184c (a) provides that in actions claiming injury or death as a result of "the negligence of a health care provider, *as defined in section 52-184b*, the claimant shall have the burden of proving . . . a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent *similar health care providers*." (Emphasis added.) The term "health care provider" as used in the initial sentence of § 52-184c (a) thus refers to the defendant health care provider, the party against whom the claim of

professional negligence is made. The second sentence of § 52-184c (a) introduces the concept of "similar health care providers."

Section 52-184c (b) establishes the standard of care for defendant health care providers who are not specialists by defining the identity of a "similar health care provider" when the defendant is not a specialist. It is important to note that § 52-184c (b) specifically provides that a "similar health care provider" must be licensed by the appropriate licensing agency "of this state *or another state* . . . ." (Emphasis added.) Section 52-184c (c) establishes the standard of care for defendant health care providers who are specialists by defining the identity of a "similar health care provider" with reference to a defendant who is not a specialist. Section 52-184c (d), which sets forth the requirements for who may testify as an expert in medical malpractice actions, provides that an expert may testify if he or she is a similar health care provider as defined in subsections (b) or (c), or possesses certain other qualifications that are set forth in § 52-184c (d) (2).

Our examination of the language of § 52-184c reveals that the statute consistently addresses two different types of health care providers. The first is the "defendant health care provider," that is, a health care provider against whom the plaintiff makes a claim of professional negligence. The second type is the "similar health care provider." A similar health care provider is identified as both the professional with reference to whom the applicable standard of care is established, as set forth in § 52-184c (a), (b) and (c), and as the expert who may testify as a witness, as set forth in § 52-184c (d). The definition of health care provider found in § 52-184b is incorporated into § 52-184c only in subsection (a) with reference to a *defendant* health care provider. There is no explicit incorporation of the definition in § 52-184b with reference to a *similar* health care provider any-

where in § 52-184c. This suggests to us that the legislature intended to incorporate the § 52-184b definition only with reference to defendant health care providers, and not with reference to similar health care providers.

This interpretation is bolstered by the express provision in § 52-184c (b) that a *similar* health care provider may be licensed in "another state." The incorporation of the definition of health care provider found in § 52-184b, which requires Connecticut licensing, into the term "similar health care providers" throughout § 52-184c would create an explicit inconsistency with § 52-184c (b), which specifically permits similar health care providers as defined in that subsection to be licensed in other states. We therefore conclude that the definition of health care provider in § 52-184b applies in § 52-184c only with reference to a *defendant* health care provider and not with reference to a *similar* health care provider.

Our conclusion is consistent with our interpretation of § 52-184c in a recent case. In *Bruttomesso v. Northeastern Connecticut Sexual Assault Crisis Services, Inc.*, 242 Conn. 1, 9, 698 A.2d 795 (1997),[15] we noted that § 52-184c incorporates the definition of health care provider in § 52-184b "[i]n defining a cause of action *against a health care provider* . . . ." (Emphasis added.)

The interpretation of § 52-184c urged by the defendants, which we reject, would effect a radical change in the trial of medical malpractice cases in this state because it would preclude expert testimony by any medical expert who is not licensed in Connecticut.

---

[15] The narrow and dispositive issue in *Bruttomesso v. Northeastern Connecticut Sexual Assault Crisis Services, Inc.*, supra, 242 Conn. 2, was whether a sexual assault crisis center that provides counseling to victims of sexual assault or abuse is a "health care provider" within the meaning of General Statutes § 52-190a.

Nothing in the legislative history of § 52-184c suggests that the legislature intended such a substantial modification in Connecticut law.

In *Grondin* v. *Curi*, supra, 262 Conn. 637, we addressed the legislative history of § 52-184c. "We note that, although the legislative history is silent about the legislature's intent as to [the process of qualifying experts in medical malpractice cases] . . . [§] 52-184c was enacted by Public Acts 1986, No. 86-338, § 11, which is popularly known as Tort Reform I. It was not intended to alter dramatically the scope of what constitutes the standard of care in a medical malpractice case or who qualifies to testify about that standard. According to Senator Richard Johnston, then chairman of the judiciary committee when the legislature enacted Public Act 86-338, § 52-184c 'codif[ies] the standard of care as it has been developed through common law and [Connecticut] case law . . . .' 29 S. Proc., Pt. 10, 1986 Sess., pp. 3479–80 (explaining statutory phrase 'in light of all relevant surrounding circumstances'). In explaining the bill, Representative William Wollenberg stated that 'what they are trying to set out here is that the witnesses shall be of similar training in similar specialties and so on so that you have . . . witnesses who have . . . similar qualifications of that person who is accused.' 29 H.R. Proc., Pt. 16, 1986 Sess., pp. 5739–40. Our review of the sparse legislative history leads us to conclude that the legislature did not intend § 52-184c to impose drastic changes on the existing standards of care or *the process of qualifying experts in medical malpractice cases*." (Emphasis added.) *Grondin* v. *Curi*, supra, 652–53.

The postenactment report of the law revision commission provides further support for our conclusion that in enacting § 52-184c, the legislature did not intend significant changes in qualifying expert medical witnesses to testify. "In large part, [§ 52-184c] restates and

codifies standards of care set under prior law. . . . The codified language contemplates a like standard . . . . Subsection (d) of [§ 52-184c] carries over the definitions of similar health care provider to the qualification of medical expert witnesses. To testify as an expert, the health care provider must qualify as a similar health care provider under subsection (b) or (c), or, if he is not a similar health care provider, must satisfy the court under subsection (d) that he has sufficient training, practice, and knowledge including practice or teaching within the five-year period to qualify. . . . As a practical matter, because subsection (d) gives the court discretion to qualify *any knowledgeable person as an expert, it seems likely that the court will continue to qualify the same witnesses as experts under [§ 52-184c] as under prior law.* The underlying test, a demonstrated knowledge of the applicable standard based on sufficient training, experience, and knowledge, is essentially the same under [§ 52-184c] as under prior law. . . . Report of the Law Revision Commission to the Judiciary Committee, Comparing Public Act 86-338, An Act Concerning Tort Reform, and Prior Connecticut Law (1987) pp. 26–27." (Emphasis in original; internal quotation marks omitted.) *Grondin* v. *Curi*, supra, 262 Conn. 653–54 n.17.

Because of our conclusion that § 52-184c incorporates the definition of health care provider from § 52-184b only with reference to defendant health care providers and not with reference to similar health care providers, we further conclude that the trial court improperly precluded the testimony of Shepherd because he is not a licensed physician in Connecticut. This conclusion, however, does not end our inquiry. We next must determine whether the exclusion of Shepherd's testimony was harmless.

"It is axiomatic that not every error is harmful." *Rossi* v. *Stanback*, 230 Conn. 175, 180, 644 A.2d 352 (1994).

.

Indeed, "[w]e have often stated that before a party is entitled to a new trial because of an [improper] evidentiary ruling, he or she has the burden of demonstrating that the [impropriety] was harmful." (Internal quotation marks omitted.) *George* v. *Ericson*, 250 Conn. 312, 327, 736 A.2d 889 (1999). "When determining that issue in a civil case, the standard to be used is whether the [improper] ruling would likely affect the result." (Internal quotation marks omitted.) *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990).

The plaintiff asserts that the trial court's preclusion of Shepherd's testimony prevented the plaintiff from establishing the prevailing standard of care. Specifically, the plaintiff contends that Shepherd's testimony would have established that the defendants should have attempted to confirm the diagnosis of a malignancy through the use of various diagnostic imaging methods before subjecting DiLieto to a total hysterectomy. In response, the defendants assert that Shepherd's testimony would have been cumulative of testimony given by two of the plaintiff's experts, Arthur D. Cromartie, an obstetrician-gynecologist, and Duane E. Townsend, a gynecological oncologist. We agree with the plaintiff and determine that the trial court's exclusion of Shepherd's testimony would likely have affected the outcome of the trial and therefore was harmful.

At trial, the plaintiff maintained that DiLieto's unusual uterine bleeding was caused by a highly cellular leiomyoma. The plaintiff intended to call Shepherd to testify that the prevailing standard of care required more thorough investigation of DiLieto's condition by the defendants, specifically, through the use of noninvasive imaging techniques, prior to performing a hysterectomy. Shepherd, a gynecologist and oncologist, had familiarity with the use of magnetic resonance imaging (MRI), color Doppler imaging, transvaginal ultrasound and hysteroscopy, and would have testified that these

techniques would have been helpful in diagnosing DiLieto's condition.

Shepherd's testimony concerning the use of imaging was not cumulative of the testimony of Cromartie and Townsend. Our review of the record reveals, as the defendants concede in their brief, that neither Cromartie nor Townsend professed to have a clear understanding of the effectiveness of imaging studies and neither offered detailed information about what might have been revealed through the use of MRI, color Doppler or transvaginal ultrasound. Shepherd, on the other hand, was prepared to testify in detail about the findings that would have resulted from transvaginal ultrasound, MRI and color Doppler scanning. We further note that both Townsend and Cromartie focused on Casper's role in the diagnosis of DiLieto's condition, while Shepherd was prepared to discuss the failings of both Casper and the Yale physicians. We therefore conclude that the trial court's improper preclusion of Shepherd's testimony likely affected the result of the trial, and, accordingly, was not harmless.

II

We address the plaintiff's remaining claims because they are likely to arise again at the new trial. The plaintiff next claims that the trial court improperly denied his request, as DiLieto's bankruptcy trustee, for access to DiLieto's tissue slides and test results pursuant to General Statutes § 20-7c.[16] The plaintiff claims that he was

[16] General Statutes § 20-7c provides in relevant part: "(a) (1) A provider, except as provided in section 4-194, shall supply to a patient upon request complete and current information possessed by that provider concerning any diagnosis, treatment and prognosis of the patient; and (2) a provider shall notify a patient of any test results in the provider's possession that indicate a need for further treatment or diagnosis.

"(b) Upon a written request of a patient, his attorney or authorized representative, or pursuant to a written authorization, a provider, except as provided in section 4-194, shall furnish to the person making such request a copy of the patient's health record, including but not limited to, bills, x-rays and copies of laboratory reports, contact lens specifications based on

DiLieto's "authorized representative" under § 20-7c and thus had the right to obtain the requested materials. In response, Yale asserts that the plaintiff lacked standing to assert a right under § 20-7c, and that even if the trial court improperly interpreted § 20-7c, Yale's subsequent denial of access to the slides and test results was harmless.[17] We agree with Yale that the plaintiff was not DiLieto's authorized representative under § 20-7c.

The following additional facts are necessary for the resolution of this claim. After learning that Yale had done further "recuts" of DiLieto's original tissue block,[18] the plaintiff filed an interrogatory requesting that Yale disclose any slides made from DiLieto's tissue and the results of any testing performed on the slides. Yale opposed the plaintiff's request on the grounds that the trustee in bankruptcy could not exercise DiLieto's rights under § 20-7c and that the pathology slides were work product.

examinations and final contact lens fittings given within the preceding three months or such longer period of time as determined by the provider but no longer than six months, records of prescriptions and other technical information used in assessing the patient's health condition. No provider shall charge more than forty-five cents per page, including any research fees, handling fees or related costs, and the cost of first class postage, if applicable, for furnishing a health record pursuant to this subsection, except such provider may charge a patient the amount necessary to cover the cost of materials for furnishing a copy of an x-ray, provided no such charge shall be made for furnishing a health record or part thereof to a patient, his attorney or authorized representative if the record or part thereof is necessary for the purpose of supporting a claim or appeal under any provision of the Social Security Act and the request is accompanied by documentation of the claim or appeal. A provider shall furnish a health record requested pursuant to this section within thirty days of the request. . . ."

[17] Yale also claims that it was not a "provider" subject to the provisions of § 20-7c, however, a review of the record reveals that Yale did not raise this claim in the trial court. "[W]e are not required to consider any claim that was not properly preserved in the trial court." *Santopietro* v. *New Haven*, 239 Conn. 207, 219–20, 682 A.2d 106 (1996). Accordingly, we do not address this claim.

[18] The original tissue block from DiLieto's D & C had been provided to the plaintiff. Slides made from this tissue block subsequently were lost after having been shared with Anderson's counsel.

After extensive argument on the issue, the trial court concluded that the plaintiff was not entitled to the slides pursuant to § 20-7c. The basis for the court's conclusion was that the statute was designed to provide patients with health care information and, as such, the statute provided DiLieto with a personal right that could not be exercised by the plaintiff bankruptcy trustee. The court therefore did not consider the work product issue.

Resolution of this issue requires us to determine whether a trustee in bankruptcy who has been substituted as the plaintiff in a medical malpractice case may exercise the patient's rights to her pathology slides pursuant to § 20-7c. As with all matters involving statutory interpretation, our review is plenary. *State* v. *Valedon,* supra, 261 Conn. 385–86; *Connor* v. *Statewide Grievance Committee,* supra, 260 Conn. 439.

We begin our analysis with the text of the statute in question, which provides in relevant part: "Upon a written request of a patient, his attorney or authorized representative . . . a provider . . . shall furnish to the person making such request a copy of the patient's health record, including but not limited to . . . laboratory reports . . . ." General Statutes § 20-7c (b). We previously have construed the term "health record" broadly and have concluded that pathology slides are a part of a patient's health record pursuant to § 20-7c. See, e.g., *Cornelio* v. *Stamford Hospital,* 246 Conn. 45, 59, 717 A.2d 140 (1998) ("[t]he legislature's intent to preserve reasonable access for a patient to that patient's health records counsels against a narrow construction of 'health record' ").

Section 20-7c does not define the term "authorized representative." We note that the plain language of § 20-7c (b) indicates that access to a patient's health record is not limited to the patient herself. The record may be provided to the patient's attorney, authorized represen-

tative or anyone else whom the patient designates in writing as her representative. General Statutes § 20-7b (a).[19]

We previously have determined that the general purpose of § 20-7c was "principally but not exclusively, to provide patients a right to examine and to obtain copies of their health records prior to the initiation of malpractice litigation.. See Conn. Joint Standing Committee Hearings, Public Health, Pt. 1, 1983 Sess., p. 170, remarks of Jackie Coleman, assistant executive director of the Connecticut Psychiatric Society; id., pp. 198–99, remarks of Brett Flamm." *Cornelio* v. *Stamford Hospital*, supra, 246 Conn. 56. The legislative history of the statute sheds no light, however, on the proper interpretation of the term "authorized representative." We turn, therefore, to the Bankruptcy Code; 11 U.S.C. § 101 et seq.; to determine whether its provisions concerning the scope of the authority exercised by a trustee in bankruptcy assist us in determining whether the trustee is an authorized representative of the debtor—here, DiLieto—for purposes of gaining access to the debtor's health records pursuant to § 20-7c.

We begin with 11 U.S.C. § 323 (a), which provides: "The trustee in a case under this title is the representative of the estate." "Although the trustee is not vested with the title of the debtor under the [Bankruptcy Code], by section 323 (a) the trustee is given full authority to represent the estate and to dispose of the debtor's property that makes up the estate. This language indicates that the trustee is the sole representative of the estate, represents all the creditors of the estate generally and is entitled to administer the property of the estate wherever located." 3 W. Collier, Bankruptcy

[19] The plaintiff does not claim that, as a factual matter, DiLieto designated him as her authorized representative, in writing or otherwise. The record reveals that for a considerable period of time, DiLieto and the plaintiff disagreed as to who should prosecute the present case.

(15th Ed. Rev. 2003) ¶ 323.02 [1], pp. 323-2 through 323-3.

Section 704 of the Bankruptcy Code sets forth a trustee's duties, which include in part that "[t]he trustee shall—(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest . . . ." 11 U.S.C. § 704. The term "[p]roperty of the estate" is defined in 11 U.S.C. § 541 (a), which provides in relevant part: "The commencement of a case . . . creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held . . . (1) Except as provided in subsections (b) and (c) (2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case. . . ." "Paragraph (1) [of 11 U.S.C. § 541 (a)] is broad. It includes all kinds of property, including both tangible and intangible property, causes of action, and all other forms of property." 5 W. Collier, supra, ¶ 541.04, p. 541-12.

This review of a trustee's authority under the Bankruptcy Code reveals that he is the representative of the debtor's *estate*, which consists of all of the debtor's property, including causes of action. The trustee also represents the *creditors* of the estate. We find no support in the Bankruptcy Code, however, for the premise that the bankruptcy trustee is the *debtor's* authorized representative or that he acquires personal rights of the debtor such as the right to examine her health records. Furthermore, we note that § 20-7c deals with an individual's health records. Thus, it involves particularly personal and sensitive material. This factor counsels strongly against interpreting "authorized representative" in such a way as to include persons or entities who are not closely associated with the "patient" whose records are sought.

Indeed, the record on appeal in the present case reveals that in proceedings before the United States Bankruptcy Court for the District of Connecticut, counsel for the plaintiff agreed to execute an affidavit in which counsel would acknowledge that upon his appointment as representative of the plaintiff, counsel would cease to represent DiLieto. The Bankruptcy Court further required the plaintiff's counsel to acknowledge that DiLieto had been informed of the termination of her representation by the plaintiff's counsel and that DiLieto's written consent to that termination had been obtained. The plaintiff's counsel was therefore required to acknowledge that "complete and exclusive allegiance" to the plaintiff meant that counsel no longer represented DiLieto. Counsel for the plaintiff executed the affidavit shortly thereafter. We therefore conclude that the trial court properly determined that the plaintiff has failed to demonstrate that he is DiLieto's authorized representative within the meaning of § 20-7c.[20]

### III

The plaintiff next claims that the trial court improperly instructed the jury that the plaintiff judicially had admitted that the announcement of the frozen section analysis results came before Edraki commenced the pelvic lymph node surgery. We agree.

The following additional facts are necessary to an understanding and the resolution of this issue. In her original complaint, DiLieto alleged that the results of the frozen section analysis were announced before the

---

[20] We do not disagree with the legal conclusion cited in the concurring and dissenting opinion that the bankruptcy trustee steps into the shoes of the debtor in order to maintain the debtor's causes of action, albeit that he does so for the benefit of creditors of the bankruptcy estate. We see no basis in the law, however, for moving from that conclusion to a determination that the trustee is the debtor's authorized representative with a right of access to the debtor's personal health records.

lymph node surgery had begun. Specifically, the original complaint stated: "During the course of the hysterectomy procedure, a report was communicated to [Casper], indicating that there was no evidence of endometrial stromal sarcoma. Following the receipt of this report, [Edraki] entered the operating room and performed upon [DiLieto] a bilateral pelvic lymphadenectomy."

Through deposition testimony, the plaintiff learned of conflicting evidence as to the timing of the announcement of the frozen section analysis and amended the complaint to omit the specific allegation that the surgery occurred after the surgeons had received the frozen section results. The plaintiff amended the complaint to read as follows: "During the course of the above-referenced procedure, no evidence of endometrial stromal sarcoma was observed and a report was communicated to [Casper], indicating that no evidence of endometrial stromal sarcoma was found during an intraoperative frozen section analysis. Despite what was observed during the hysterectomy procedure and despite the absence of evidence of endometrial stromal sarcoma on the frozen section analysis . . . [Edraki] surgically removed pelvic lymph nodes from [DiLieto] . . . ."

The plaintiff maintained at trial and claims on appeal that the amended allegation allowed for Casper and Edraki to have learned the results of the frozen section either before or after beginning the surgery to remove DiLieto's lymph nodes. The trial court, however, construed both versions of this allegation as having the same meaning and determined that the plaintiff judicially had admitted the facts as alleged. The trial court therefore instructed the jury that the plaintiff was bound to a theory of negligence with regard to the lymph node dissection that Edraki knew of DiLieto's lack of

malignancy prior to beginning the lymph node surgery.[21] We agree with the plaintiff that the trial court improperly construed the pleadings and consequently improperly instructed the jury.

The plaintiff's claim implicates the trial court's construction of the pleadings. "[T]he interpretation of pleadings is always a question of law for the court . . . ." (Internal quotation marks omitted.) *Grimes* v. *Housing Authority*, 242 Conn. 236, 249, 698 A.2d 302 (1997). Our review of the trial court's interpretation of the pleadings therefore is plenary.

We note that "[t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and *realistically*, rather than narrowly and technically." (Emphasis in original; internal quotation marks omitted.) Id. "[T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties." (Internal quotation marks omitted.) *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 83, 700 A.2d 655 (1997).

In the present case, the plaintiff amended the complaint to allow for a finding of negligence despite conflicting versions of the timing of the announcement of

---

[21] The trial court instructed the jury as follows: "In particular, the claims against [Casper] and [Edraki] with respect to their performance of pelvic lymph node surgery on [DiLieto] 'without first ascertaining that the frozen section analysis of her uterus was positive for endometrial stromal sarcoma,' you must know that this claim is not based on when the results of the frozen section were communicated to any of the doctors in relation to the start of the surgery, for the plaintiff has alleged in his complaint that the results of that analysis were communicated to . . . Casper and Edraki before the pelvic lymph node surgery began, and [the plaintiff is] bound by that allegation as a judicial admission. Instead, the plaintiff's claim on this subject is that since the results of the frozen section analysis were negative for endometrial stromal sarcoma, proceeding with the surgery or allowing it to proceed was a violation of the prevailing standard of care."

the results from the frozen section analysis. Specifically, he deleted the words "[f]ollowing the receipt of this report" at the beginning of a sentence that immediately thereafter stated "[Edraki] entered the operating room and performed upon [DiLieto] a bilateral pelvic lymphadenectomy." The amended pleading was not a model of clarity because of the insertion of a new phrase in substitution for the deleted one. We conclude, however, that the trial court's construction of the amended pleading was unduly narrow and technical. Construing both pleadings as having the same meaning vitiates the plaintiff's purpose in making the amendment following the deposition testimony. The plaintiff appropriately argued for the broadest construction of the allegations of the amended complaint. Accordingly, we determine that the trial court improperly instructed the jury that the plaintiff judicially had admitted that the announcement of the frozen section results came before Edraki commenced the pelvic lymph node surgery.

## IV

The plaintiff next claims that the trial court improperly excluded as speculative proposed testimony by DiLieto regarding what she might have done differently had she been told that her condition possibly was benign. More specifically, the plaintiff claims that the trial court misinterpreted *Burns* v. *Hanson*, 249 Conn. 809, 734 A.2d 964 (1999), as requiring the preclusion of DiLieto's testimony, which was relevant to causation. In response, the defendants assert, inter alia, that the trial court properly excluded DiLieto's testimony because she lacked prior experience with the hysterectomy procedure, a requirement that the defendants found in their reading of *Burns*. We agree with the plaintiff.

The following undisputed facts guide the resolution of this claim. Before trial, the plaintiff indicated that

he intended to offer evidence that DiLieto had not been fully informed of her medical condition and that she would testify at trial as to what course of treatment she would have chosen had she been told that her condition might have been benign. Yale filed a motion in limine, arguing that because there was no informed consent claim before the court, the proffered evidence was irrelevant. Anderson also filed a motion in limine, but on the ground that such testimony would be unduly speculative. The trial court reserved decision on Anderson's motion until trial. When the evidence was proffered at trial, the trial court precluded the testimony as being too speculative.

We begin our analysis of this issue by setting forth the governing standard of review. "On appeal, we must accord the trial court's evidentiary rulings great deference. . . . Indeed, we will make every reasonable presumption in favor of upholding [those] ruling[s] . . . [upsetting them only] for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Whitford*, 260 Conn. 610, 636, 799 A.2d 1034 (2002).

"It is axiomatic that [e]vidence is admissible only to prove material facts, that is to say, those facts directly in issue or those probative of matters in issue; evidence offered to prove other facts is immaterial." (Internal quotation marks omitted.) *Salmon* v. *Dept. of Public Health & Addiction Services*, 259 Conn. 288, 316, 788 A.2d 1199 (2002). We note, however, that "evidence is admissible if it has a tendency to support a fact relevant to the issues if only in a slight degree." (Internal quotation marks omitted.) *Burns* v. *Hanson*, supra, 249 Conn. 825.

In *Burns*, we addressed the admissibility of arguably speculative testimony in a medical malpractice case. The plaintiff, a woman suffering from severe multiple

sclerosis, brought a wrongful birth claim against the defendant gynecologist who, "knowing both of her condition and that it was medically undesirable for her to become pregnant, incorrectly advised her that she was sterile and failed to diagnose her pregnancy after an examination early in her second trimester." Id., 811. The trial court had precluded the plaintiff from testifying that she likely would have chosen to have had an abortion had the physician told her that she was pregnant in a timely fashion, concluding that such testimony was speculative. Id., 823.

We reversed the ruling of the trial court, concluding that "the plaintiff's testimony as to what she would have done had the defendant advised her that she was pregnant was not speculative but, rather, was based on her personal knowledge. The plaintiff was not coming to the issue afresh on the witness stand. She had personal experience with deciding to terminate a pregnancy, having undergone an abortion many years earlier when she was an unmarried teenager. In accordance with medical advice concerning her progressive multiple sclerosis, the plaintiff and her husband had made the conscious decision not to have another child. *The plaintiff's life experiences made her an appropriate witness* to inform the jury about her choices. While her answer, had she been permitted to give one, might have been self-serving, it would not have been speculative. As we [previously have] explained . . . [w]hether the jury would have credited such testimony is not the issue before us; the question, rather, is whether the testimony was reasonably likely to have assisted the jury . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 826.

In the present case, the trial court interpreted our ruling in *Burns* as *requiring* that an individual have personal experience with a particular procedure before being able to testify as to whether he or she would have

undergone that procedure. We did not intend such a result. We concluded in *Burns* that the testimony was admissible because it was based on the plaintiff's personal knowledge and life experience, and therefore was not speculative. So, too, in the present case, DiLieto, a woman in her forties, could have testified, based on her personal knowledge and life experience, whether she would have undergone the hysterectomy knowing that her condition might have been benign. We conclude that the trial court improperly excluded DiLieto's testimony as speculative.

The trial court, having first determined that DiLieto's proposed testimony was unduly speculative, did not address Yale's objection regarding the relevance of such testimony. We, therefore, address the question of whether DiLieto's proposed testimony was relevant to a material issue. We determine that although her testimony would not have been dispositive, DiLieto's proposed testimony was indeed relevant to the issue of causation. Hearing what course of treatment DiLieto would have pursued had she known that her condition was possibly benign would have been helpful to the jury in evaluating the plaintiff's claim that a failure to communicate the differential diagnosis to DiLieto led, in part, to the performance of unnecessary surgery.

V

We next address the applicability of the plaintiff's claims to Anderson, the pathologist who performed the initial examination and diagnosis of the tissue from the D & C performed on DiLieto. The plaintiff claims that any determination of harmful impropriety with regard to any issue raised in this appeal would entitle the plaintiff to a new trial against all of the remaining defendants, including Anderson. In response, Anderson asserts that only the last of the plaintiff's claims—that the trial court improperly precluded DiLieto's testimony

as to the course of treatment that she might have chosen—implicates Anderson's limited role in this case. Anderson further asserts that because: (1) DiLieto's testimony was relevant to the issue of causation; and (2) the jury found that Anderson was not negligent, any impropriety with regard to DiLieto's testimony was not harmful with regard to the plaintiff's claim against Anderson. We agree with Anderson.

At the conclusion of the evidence and after the charge to the jury, the trial court submitted interrogatories for the jury to answer. The first interrogatory, in separate subparts, asked the jury whether each of the defendants was professionally negligent. The jury responded that Anderson was not negligent, and returned a verdict in his favor.

We concluded in part IV of this opinion that the trial court improperly precluded DiLieto's testimony as to what she would have done had she known that her condition possibly might have been benign. We further concluded that her testimony was relevant to the issue of causation. Because the jury found that Anderson was not negligent, the jury never reached the issue of causation with regard to Anderson's alleged negligence. The preclusion of DiLieto's testimony about causation therefore had no bearing with regard to Anderson, and was not harmful with regard to the claim against him.

The judgment of the trial court is reversed only with respect to Yale and the case is remanded for a new trial against that defendant; the judgment of the trial court is affirmed in all other respects.

In this opinion BORDEN and PALMER, Js., concurred.

---

ZARELLA, J., with whom SULLIVAN, C. J., joins, concurring in part and dissenting in part. I concur in the

majority opinion insofar as it reverses the judgment of the trial court and remands the case for a new trial. I respectfully disagree, however, with the conclusion that the majority reaches in part II of its opinion.

In part II of its opinion, the majority concludes that a trustee in bankruptcy who has been substituted as a plaintiff for a bankruptcy debtor in a medical malpractice action may not have access to pathology slides of the debtor's tissue and any accompanying pathology reports pursuant to General Statutes § 20-7c. More specifically, the majority concludes that a bankruptcy trustee is not the debtor's "authorized representative" for purposes of § 20-7c and, consequently, cannot have access to the debtor's medical records, which, in the present case, include slides of the debtor's uterine tissue and reports generated in connection with the analysis of that tissue. I disagree with the majority's conclusion based on the language of §20-7c, relevant state law and bankruptcy law.

The majority concludes that the plaintiff trustee, Michael J. Daly, is not the "authorized representative" of the named plaintiff debtor, Michelle DiLieto, for purposes of § 20-7c and, therefore, is not entitled to access, inter alia, slides of DiLieto's tissue pursuant to that statute. General Statutes § 20-7c provides in relevant part: "(b) Upon a written request of a patient, his attorney or authorized representative, or pursuant to a written authorization, a provider . . . shall furnish to the person making such request a copy of the patient's health record . . . ."

The majority notes that § 20-7c does not define the term "authorized representative," and that the legislative history sheds no light on the proper interpretation of that term.[1] The majority acknowledges, however, that

---

[1] I reaffirm my continuing belief in the plain meaning rule as expressed in my dissenting opinion in *State* v. *Courchesne*, 262 Conn. 537, 597, 618–19, 816 A.2d 562 (2003) (*Zarella, J.*, dissenting).

the general purpose of the statute is " 'principally but not exclusively, to provide patients a right to examine and to obtain copies of their health records prior to the initiation of malpractice litigation.' " The majority then reviews the United States Bankruptcy Code (code), 11 U.S.C. § 101 et seq., and ultimately concludes that, although the trustee is the representative of both the debtor's estate, "which consists of all of the debtor's property, including causes of action," and the creditors of the estate, there is nothing in the code to support "the premise that the bankruptcy trustee is the debtor's authorized representative or that he acquires personal rights of the debtor such as the right to examine her health records."

Federal courts have held that "[t]he appointment of a Chapter 7 trustee results in his becoming the sole representative of the [debtor's] estate." *Nova Telecom, Inc.* v. *Long Distance Management Systems, Inc.*, No. 00-2113, 2000 U.S. Dist. LEXIS 15510, *13 (E.D. Pa. October 25, 2000). "The primary duty of the chapter 7 trustee is to collect and reduce to money property of the estate . . . ." (Internal quotation marks omitted.) *In re Bowker*, 245 B.R. 192, 195 (Bankr. D.N.J. 2000), quoting 11 U.S.C. § 704 (1) (2000). "[A] bankruptcy estate encompasses a wide variety of assets. See 11 U.S.C. § 541 (a) (1994). It includes . . . all legal or equitable interests of the debtor in property as of the commencement of the case . . . as well as any interest in property that the estate acquires after the commencement of the case . . . [11 U.S.C. § 541 (a) (1) and (7) (1994)]. These provisions have been interpreted broadly, and include an interest in a cause of action." (Citation omitted; internal quotation marks omitted.) *Kollar* v. *Miller*, 176 F.3d 175, 178 (3d Cir. 1999); see also H.R. Rep. No. 95-595, p. 175 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6136 (under Bankruptcy Reform Act of 1978, codified as amended at 11 U.S.C. § 101 et seq., debtor's estate

includes, inter alia, "all interests, such as interests in real or personal property, tangible and intangible property . . . [and] causes of action"). Accordingly, "[t]he trustee steps into the shoes of the debtor for the [purpose] of asserting or maintaining the debtor's causes of [action] . . . ." *In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896, 901 (1st Cir. 1988). "It is clear, therefore, that, after appointment of a trustee, a Chapter 7 debtor no longer has standing to pursue a cause of action which existed at the time the Chapter 7 petition was filed. Only the trustee, as representative of the estate, has the authority to prosecute and/or settle such causes of action." *Cain* v. *Hyatt*, 101 B.R. 440, 442 (Bankr. E.D. Pa. 1989).

One can deduce from the foregoing principles that, by stepping into the shoes of the debtor for the purpose of maintaining a cause of action, the trustee acquires all the necessary rights and powers, including personal rights, related to the cause of action. Indeed, the bankruptcy trustee, by standing in the shoes of the debtor, "has *all* of the rights the bankrupt [debtor] had"; (emphasis added) *In re Urban*, 136 F.2d 296, 298 (7th Cir. 1943); and is "vested with the causes of actions pending at the date of filing the bankruptcy . . . and with the [debtor's] personal property . . . ." (Citations omitted.) *Skelton* v. *Clements*, 408 F.2d 353, 354 (9th Cir. 1969). Moreover, in order to promote the effectuation of the fundamental purposes of the code, "it is necessary and desirable that the amount of property included in the bankruptcy estate be as inclusive as possible." 5 W. Collier, Bankruptcy (15th Rev. Ed. 2003) ¶ 541.01, p. 541-7. In my view, therefore, the majority's conclusion that the code only provides the trustee with limited rights and powers, which do not include personal rights, such as the right to access medical records in furtherance of the prosecution of a medical malpractice claim,

pays short shrift to these well settled principles of bankruptcy law.

Furthermore, the majority appears to base its decision on the conclusion that § 20-7c creates a personal right to obtain medical records that is not subject to exercise by the trustee. The majority offers no support for this conclusion, however. The majority states that "§ 20-7c deals with an individual's health records. Thus, it involves particularly personal and sensitive material. This factor counsels strongly against interpreting 'authorized representative' in such a way as to include persons or entities [that] are not closely associated with the 'patient' whose records are sought."

I do not dispute the fact that information contained in medical records is of a personal and sensitive nature. The majority, however, loses sight of the fact that, under well settled principles of bankruptcy law, a trustee is designated as the debtor's "authorized representative" for purposes of asserting and maintaining the debtor's causes of action. In my view, a "patient" cedes any right he may have in preventing the trustee from gaining access to his medical records by filing for bankruptcy when his estate includes a cause of action for medical malpractice to which those medical records pertain. Under such circumstances, the medical records of the patient/debtor lose, at least to some degree, their status as purely personal records.

In sum, I disagree with the majority's conclusion that the right to access medical records under § 20-7c is so personal to the debtor that it does not transfer to the trustee as a necessary part of trustee's authority to assert and maintain the debtor's cause of action for medical malpractice.